## FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EARL F. ARAKAKI; EVELYN C.
ARAKAKI; EDWARD U. BUGARIN;
SANDRA P. BURGESS; PATRICIA A.
CARROLL; ROBERT M. CHAPMAN;
MICHAEL Y. GARCIA; TOBY M.
KRAVET; JAMES I. KUROIWA;
FRANCES M. NICHOLS; DONNA
MALIA SCAFF; JACK H. SCAFF;
ALLEN TESHIMA; THURSTON TWIGG-
SMITH,
          *Plaintiffs-Appellants,*

ANTHONY SANG, SR., State Council
of Hawaiian Homestead
Associations (SCHHA); STATE
COUNCIL OF HAWAIIAN HOMESTEAD
ASSOCIATIONS,
          *Intervenors-Appellees,*

                    v.

LINDA C. LINGLE, in her official
capacity as Governor of the State
of Hawaii; HAUNANI APOLIONA,
Chairman, and in her official
capacity as trustee of the Office of
Hawaiian Affairs; ROWENA AKANA,
in his official capacity as trustee
of the Office of Hawaiian Affairs;
DONALD CATALUNA, in his official
capacity as trustee of the Office of
Hawaiian Affairs; LINDA DELA
CRUZ, in her official capacity as

No. 04-15306
D.C. No.
CV-02-00139-SOM/
KSC
OPINION

1573

trustee of the Office of Hawaiian
Affairs; CLAYTON HEE, in his
official capacity as trustee of the
Office of Hawaiian Affairs;
COLETTE Y. MACHADO, in her
official capacity as trustee of the
Office of Hawaiian Affairs;
CHARLES OTA, in his official
capacity as trustee of the Office of
Hawaiian Affairs; OSWALD K.
STENDER, in his official capacity as
trustee of the Office of Hawaiian
Affairs; JOHN D. WAIHEE, IV, in
his official capacity as trustee of
the Office of Hawaiian Affairs;
UNITED STATES OF AMERICA; JOHN
DOES, 1 through 10; GEORGINA
KAWAMURA, in her official capacity
as Director of the Department of
Budget and Finance; RUSS SAITO,
in her official capacity as
Comptroller and Director of the
Department of Accounting and
General Services; PETER YOUNG, in
his official capacity as Chairman
of the Board of Land and Natural
Resources; SANDRA LEE KUNIMOTO,
in her official capacity as Director
of the Department of Argiculture;
TED LIU, in his official capacity as
Director of the Department of
Business, Economic Development
and Tourism; RODNEY HARAGA, in

his official capacity as Director of
the Department of Transportation;
QUENTIN KAWANANAKOA, member
of the Hawaiian Homes
Commission,
                    *Defendants-Appellees.*

On Remand from the United States Supreme Court

Filed February 9, 2007

Before: Melvin Brunetti, Susan P. Graber, and Jay S. Bybee,
Circuit Judges.

Opinion by Judge Bybee

## SUMMARY

### Constitutional Rights/Civil Rights

The court of appeals affirmed a judgment of the district court in part, reversed in part, and remanded. The court held that plaintiffs, as state taxpayers, lacked standing to bring a suit claiming that Office of Hawaiian Affairs (OHA) programs that were funded by state tax revenue violated the Equal Protection Clause of the Fourteenth Amendment.

Appellants, citizens of the state of Hawaii, brought suit in district court against appellees the Department of Hawaiian Home Lands (DHHL), the Hawaiian Homes Commission (HHC), the OHA, various state officers, and the United States, alleging that various state programs preferentially treated persons of Hawaiian ancestry, in violation of the Fifth and Fourteenth Amendments, 42 U.S.C. § 1983, and the terms

of a public land trust. The citizens claimed standing to sue as taxpayers and as beneficiaries of the public land trust. The citizens argued that Congress' failure, so far, to recognize Hawaiians' tribal status did not prevent the courts from deciding whether OHA's Hawaiian-preference violated the Equal Protection Clause. With respect to the DHHL/HHC, the court ruled that the United States was an indispensable party to the lease eligibility requirements, but that the citizens had no standing to sue the United States. Because any challenge to the lessee requirements of the Hawaiian Home Lands lease program set up by the Hawaiian Homes Commission Act, a state law, necessarily involved a challenge to the Admission Act, all claims against the DHHL/HHC were dismissed. The court dismissed the breach of trust claim on the ground that the citizens had not pleaded a breach of trust claim that was cognizable under the common law of trusts. Finding that the citizens had state taxpayer standing to sue OHA, the court declined to dismiss OHA because nothing in the Admission Act required the creation of OHA or governs OHA's actions. The court limited the citizens' taxpayer challenge, however, to OHA programs funded from taxes, as opposed to programs funded from other sources. However, the district court dismissed all claims against OHA on the ground that they were barred by the political question doctrine.

The citizens appealed. In a prior opinion, the court of appeals affirmed in part and reversed in part. On the state's petition for certiorari, the Supreme Court granted the petition, vacated the court of appeals' prior judgment, and remanded for further consideration in light of a recent Supreme Court decision.

[1] In the Admission Act, the United States granted to the state of Hawaii, effective upon its admission in the Union, the United States' title to all the public lands and other public property, and to all lands defined as "available lands" by § 203 of the Hawaiian Homes Commission Act, title which is held by the United States immediately prior to its admission

into the Union. **[2]** The Admission Act unambiguously requires that land be held in public trust, but by the state of Hawaii, not the United States. It had to be concluded that the United States has only a somewhat tangential supervisory role of the Admission Act, rather than the role of trustee.

**[3]** The Ninth Circuit has recently held that in any challenge to the enforceability of the DHHL/HHC lease eligibility requirements, the United States is an indispensable party. **[4]** The citizens lacked standing to sue the United States and therefore could not maintain their challenge to the lease eligibility requirements against the state. Accordingly, the district court properly dismissed the citizens' trust beneficiary claim against the state defendants.

**[5]** The only ground the citizens alleged for enjoining the state from spending was that the spending was for purposes prohibited by the Equal Protection Clause. Any remedy that the citizens sought demanded that the district court decide whether the lease eligibility criteria were constitutional. The lease criteria were found in the HHCA, which was adopted by Article XII of the Hawaii Constitution. Any challenge to Article XII is a challenge to § 4 of the Admission Act, and no challenge to the Admission Act may proceed without the presence of the United States as a defendant. **[6]** As state taxpayers, the citizens had no basis for suing the United States. **[7]** It had to be concluded that the citizens lacked standing to sue the United States, and that the United States remained an indispensable party to any challenge to the DHHL/HHC lease eligibility criteria. The district court's dismissal of all claims against the United States and DHHL/HHC had to be affirmed.

**[8]** The Ninth Circuit has held that at least some individual plaintiffs had standing to seek an injunction prohibiting the appropriating, transferring, and spending of taxpayers' money from the state treasury's general fund. However, the Supreme Court has effectively overruled this decision. **[9]** The Court has held that state taxpayers must establish a particularized,

concrete injury that is redressable by the court's judgment. The Court observed that plaintiffs' alleged injury is speculative if redress ultimately depends on how the legislature responds to the court's judgment. The Court concluded that state taxpayers have no standing under Article III to challenge state tax or spending decisions simply by virtue of their status as taxpayers. [10] Here, the Hawaii citizens did not allege that they suffered any harm apart from the fact that they were taxpayers and did not like OHA's programs. [11] Whether or not their injury was redressable was entirely speculative. Even if all funding for OHA were terminated, it was not certain what the Legislature would do with the funds. [12] Any benefit that would accrue to the citizens from an injunction or declaratory judgment was also speculative. [13] It had to be held that these state taxpayers had no standing under Article III to challenge a Hawaii state tax or spending decision simply by virtue of their status as taxpayers. The case had to be remanded to the district court for further proceedings.

[14] Because the citizens could prevail against OHA without holding § 4 of the Admissions Act unconstitutional, nothing required the participation of the United States.

[15] The United States is an indispensable party with respect to challenges to the expenditure of trust revenue. [16] However, the citizens could not establish standing to sue the United States either as taxpayers or as trust beneficiaries. The district court's dismissal of the breach of trust claim against OHA had to be affirmed on the alternative ground that the citizens could not demonstrate standing to sue an indispensable party.

[17] The Ninth Circuit has noted that if the question before it were whether a remedy would lie against Congress to compel tribal recognition, the answer would be readily apparent: a suit that sought to direct Congress to federally recognize an Indian tribe would be non-justiciable as a political question. [18] Nothing in the claims the citizens asserted or the remedy

they sought invited the district court to exercise powers reserved to Congress or to the president. **[19]** Assuming that some citizens had standing, the citizens' claims squarely and exclusively raised a Fourteenth Amendment claim.

**[20]** The court of appeals also ruled that the district court did not abuse its discretion in: managing the summary judgment phase of the trial, **[21]** awarding modest costs to select defendants, or **[22]** denying the citizens' motion to compel discovery.

---

## COUNSEL

H. William Burgess, Honolulu, Hawaii, for the plaintiffs-appellants.

Sherry P. Broder, Honolulu, Hawaii; Girard D. Lau, Charleen M. Aina, Office of the Attorney General of Hawaii, Honolulu, Hawaii; Jon M. Van Dyke, William S. Richardson School of Law, Honolulu, Hawaii; Aaron P. Avila, U.S. Department of Justice, Washington, D.C.; Thomas A. Helper, Office of the U.S. Attorney, Honolulu, Hawaii, for the defendants-appellees.

Walter R. Schoettle, Honolulu, Hawaii; Robert Klein, Honolulu, Hawaii; Philip W. Miyoshi, McCorriston Miller Mukai MacKinnon LLP, Honolulu, Hawaii, for the intervenors-appellees.

Le'a Malia Kanehe, Native Hawaiian LegalCorp., Honolulu, Hawaii, for the amici curiae.

---

## OPINION

BYBEE, Circuit Judge:

In this case we are called on, yet again, to hear a challenge to state programs restricting benefits to "native Hawaiians" or

"Hawaiians." *See, e.g., Carroll v. Nakatani*, 342 F.3d 934 (9th Cir. 2003); *Arakaki v. Hawaii*, 314 F.3d 1091 (9th Cir. 2002); *Han v. U.S. Dep't of Justice*, 45 F.3d 333 (9th Cir. 1995) (per curiam); *Price v. Akaka*, 3 F.3d 1220 (9th Cir. 1993); *Price v. Hawaii*, 764 F.2d 623 (9th Cir. 1985); *Hoohuli v. Ariyoshi*, 741 F.2d 1169 (9th Cir. 1984); *Keaukaha-Panaewa Cmty. Ass'n v. Hawaiian Homes Comm'n*, 588 F.2d 1216 (9th Cir. 1978); *see also Rice v. Cayetano*, 528 U.S. 495 (2000).

Plaintiffs in this case are citizens of the State of Hawaii who allege that various state programs preferentially treat persons of Hawaiian ancestry, in violation of the Fifth and Fourteenth Amendments, 42 U.S.C. § 1983, and the terms of a public land trust. Plaintiffs brought suit against the Department of Hawaiian Home Lands ("DHHL"), the Hawaiian Homes Commission ("HHC"), the Office of Hawaiian Affairs ("OHA"), various state officers, and the United States. Plaintiffs claim standing to sue as taxpayers and as beneficiaries of the public land trust. In a series of orders, the district court held that Plaintiffs lacked standing to raise certain claims and that Plaintiffs' remaining claims raised a nonjusticiable political question, and dismissed the entire lawsuit. *Arakaki v. Lingle*, 305 F. Supp. 2d 1161 (D. Haw. 2004) ("*Arakaki VI*"); *Arakaki v. Lingle*, 299 F. Supp. 2d 1129 (D. Haw. 2003) ("*Arakaki V*"); *Arakaki v. Lingle*, 299 F. Supp. 2d 1114 (D. Haw. 2003) ("*Arakaki IV*"); *Arakaki v. Cayetano*, 299 F. Supp. 2d 1107 (D. Haw. 2002) ("*Arakaki III*"); *Arakaki v. Cayetano*, 299 F. Supp. 2d 1090 (D. Haw. 2002) ("*Arakaki II*"); *Arakaki v. Cayetano*, 198 F. Supp. 2d 1165 (D. Haw. 2002) ("*Arakaki I*"). The district court also issued three unpublished orders, dated December 16, 2003, January 26, 2004, and May 5, 2004, which this opinion will address.

In a prior opinion, we affirmed in part and reversed in part. *Arakaki v. Lingle*, 423 F.3d 954 (9th Cir. 2005). The Plaintiffs filed a petition for certiorari, which the Supreme Court denied. *Arakaki v. Lingle*, 126 S. Ct. 2861 (2006). On the state's petition for certiorari, however, the Supreme Court

granted the petition, vacated our prior judgment and remanded for further consideration in light of *DaimlerChrysler Corp. v. Cuno*, 547 U.S. ___, 126 S. Ct. 1854 (2006). *Lingle v. Arakaki*, 126 S. Ct. 2859 (2006). On reconsideration, we again affirm in part and reverse in part, although on different grounds. In the interest of clarity for all interested parties, we are issuing a complete opinion in support of our judgment following remand from the Supreme Court.

We hold that Plaintiffs lack standing to sue the federal government and that the district court therefore correctly dismissed all claims to which the United States is a named party or an indispensable party. However, we reverse the district court's finding that Plaintiffs have demonstrated standing as state taxpayers to challenge those programs that are funded by state tax revenue and for which the United States is not an indispensable party. In light of the Supreme Court's decision in *DaimlerChrysler*, we now hold that Plaintiffs, as state taxpayers, lack standing to bring a suit claiming that the OHA programs that are funded by state tax revenue violate the Equal Protection Clause of the Fourteenth Amendment. Although it is not clear that any Plaintiffs have standing in any other capacity to challenge the OHA programs, we remand to the district court for further proceedings. Finally, if any Plaintiffs are able to establish standing, their challenge to the appropriation of tax revenue to the OHA does not raise a nonjusticiable political question. We therefore affirm in part, reverse in part, and remand.

## I.  BACKGROUND

### A.  *Historical Context*

After the arrival of Captain Cook in 1778, the western world became increasingly interested in the commercial potential of the Hawaiian Islands. The nineteenth century saw a steady rise in American and European involvement in the islands' political and economic affairs. As the resistance of

the native Hawaiian government mounted, American commercial interests eventually succeeded, with the complicity of the U.S. military, in overthrowing the Hawaiian monarchy and establishing a provisional government under the title of the Republic of Hawaii. *See Rice*, 528 U.S. at 500-05.

In 1898, President McKinley signed a Joint Resolution to annex the Hawaiian Islands as a territory of the United States. 30 Stat. 750. This resolution, commonly referred to as the Newlands Resolution, provided that the Republic of Hawaii ceded all public lands to the United States and that revenues from the lands were to be "used solely for the benefit of the inhabitants of the Hawaiian Islands for educational and other public purposes." *Id.* Two years later, the Hawaiian Organic Act established the Territory of Hawaii and put the ceded lands in the control of the Territory of Hawaii "until otherwise provided for by Congress." Act of Apr. 30, 1900, ch. 339, § 91, 31 Stat. 159.

B.   *The Public Land Trust and the Hawaiian Homes Commission Act*

Shortly after the establishment of the Territory, Congress "became concerned with the condition of the native Hawaiian people." *Rice*, 528 U.S. at 507. Declaring its intent to "[e]stablish[ ] a permanent land base for the beneficial use of native Hawaiians," Congress enacted the Hawaiian Homes Commission Act, 1920, Act of July 9, 1921, ch. 42, § 101(b)(1), 42 Stat. 108 ("HHCA"). The HHCA set aside 200,000 acres of lands previously ceded to the United States for the creation of loans and leases to benefit native Hawaiians. These lands were to be leased exclusively, including by transfer, to native Hawaiians for a term of 99 years at a nominal rate of one dollar per year. *Id.* § 208(1), (2) & (5). The HHCA defines "native Hawaiian" as "any descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778." *Id.* § 201(7).

In 1959, Hawaii became the 50th State in the union. Under the Hawaii Statehood Admission Act, Congress required Hawaii to incorporate the HHCA into its state Constitution, with the United States retaining authority to approve any changes to the eligibility requirements for the HHCA leases. Act of March 18, 1959, Pub. L. No. 86-3, § 4, 73 Stat. 5 ("Admission Act"). *See* HAW. CONST. art. XII, §§ 1-3. In return, the United States granted Hawaii title to all public lands within the state, save a small portion reserved for use of the Federal Government. *Id.* § 5(b)-(d), 73 Stat. 5. The Admission Act further declared that the lands, "together with the proceeds from the sale or other disposition of any such lands and the income therefrom, shall be held by [the State] as a public trust for the support of the public schools, . . . the conditions of native Hawaiians" and other purposes. *Id.* § 5(f), 73 Stat. 6. The land granted to Hawaii included the 200,000 acres previously set aside under the HHCA and an additional 1.2 million acres.

The Hawaii Constitution expressly adopted the HHCA and declared that "the spirit of the Hawaiian Homes Commission Act looking to the continuance of the Hawaiian homes projects for the further rehabilitation of the Hawaiian race shall be faithfully carried out." HAW. CONST. art. XII, § 2. Because the HHCA's purposes include support of public education, the Constitution also provides that lands granted to Hawaii under the Admission Act will be held in "public trust for native Hawaiians and the general public." *Id.* § 4; *see Arakaki v. Hawaii*, 314 F.3d 1091, 1093 (9th Cir. 2002).

The HHCA established a Department of Hawaiian Home Lands ("DHHL"), to be headed by an executive board known as the Hawaiian Homes Commission ("HHC"). Act of July 9, 1921, ch. 42, § 202(a), 42 Stat. 108. By statute Hawaii created both the Department of Hawaiian Home Lands and the Hawaiian Homes Commission. Together, DHHL/HHC administer the 200,000 acres set aside by the HHCA, and DHHL/HHC's beneficiaries are limited to "native Hawai-

ians," as defined in the Act. The DHHL is funded in substantial part by state revenue; although the record is not clear on this point, this revenue likely derives from both tax and non-tax sources.

## C.  *The Office of Hawaiian Affairs*

In 1978, Hawaii amended its Constitution to establish the Office of Hawaiian Affairs to " 'provide Hawaiians the right to determine the priorities which will effectuate the betterment of their condition and welfare and promote the protection and preservation of the Hawaiian race, and . . . [to] unite Hawaiians as a people.' " *Rice,* 528 U.S. at 508 (quoting 1 Proceedings of the Constitutional Convention of Hawaii of 1978, Committee of the Whole Rep. No. 13, p. 1018 (1980)). OHA holds title to all property "held in trust for native Hawaiians and Hawaiians," *except* for the 200,000 acres administered by DHHL/HHC; OHA thus controls the 1.2 million acres ceded by the United States in the Admission Act. The term "native Hawaiians" has the same blood quantum requirement as under the HHCA; by contrast, the term "Hawaiians" is broader and simply refers to any persons descended from inhabitants of the Hawaiian Islands prior to 1778. HAW. REV. STAT. § 10-2. OHA's statutory purposes include "[a]ssessing the policies and practices of other agencies impacting on native Hawaiians and Hawaiians," "conducting advocacy efforts for native Hawaiians and Hawaiians," "[a]pplying for, receiving, and disbursing, grants and donations from all sources for native Hawaiian and Hawaiian programs and services," and "[s]erving as a receptacle for reparations." HAW. REV. STAT. § 10-3(4)-(6).

OHA administers funds received from two principal sources. First, OHA receives a 20 percent share of any revenue generated by the 1.2 million acres of lands held in public trust. HAW. REV. STAT. § 10-13.5 (1993). Second, OHA receives revenue from the state general fund, which derives from tax revenue and other, non-tax, sources.

## D.  The Proceedings

The Plaintiffs (some of whom qualify as "Hawaiians") allege that they are citizens of Hawaii, taxpayers of the state of Hawaii and of the United States, and beneficiaries of a public land trust created in 1898. The Complaint alleges three causes of action. First, Plaintiffs allege that the various programs of the OHA and DHHL/HHC violate the Equal Protection Clause of the Fourteenth Amendment and the equal protection component of the Due Process Clause of the Fifth Amendment. Second, they make these same allegations under 42 U.S.C. § 1983. Third, they claim that the administration of the OHA and the DHHL/HHC constitutes a breach of the public land trust.

The district court dismissed Plaintiffs' claims on grounds of standing and political question. With respect to the DHHL/HHC, the court ruled that the United States was an indispensable party to the lease eligibility requirements, but that Plaintiffs had no standing to sue the United States. *Arakaki IV*, 299 F. Supp. 2d at 1120-25. Because "any challenge to the lessee requirements of the Hawaiian Home Lands lease program set up by the HHCA, a state law, necessarily involves a challenge to the Admission Act," all claims against the DHHL/HHC were dismissed. *Id.* at 1126, 1127.

The district court took a slightly different route with respect to OHA. The court dismissed the breach of trust claim on the ground that Plaintiffs had not pleaded a breach of trust claim that is cognizable under the common law of trusts. *Arakaki II*, 299 F. Supp. 2d at 1103. Finding that Plaintiffs had state taxpayer standing to sue OHA, the court declined to dismiss OHA because, unlike DHHL/HHC, "[n]othing in the Admission Act requires the creation of OHA or governs OHA's actions." *Arakaki IV*, 299 F. Supp. 2d at 1127. The court limited the Plaintiffs' taxpayer challenge, however, to OHA programs funded from taxes, as opposed to programs funded from other sources. *Arakaki II*, 299 F. Supp. 2d at 1100-01;

*Arakaki IV*, 299 F. Supp. 2d at 1122-24. In a subsequent decision, however, the district court dismissed all claims against OHA on the ground that they were barred by the political question doctrine. The court observed that, although Congress has plenary authority to recognize Indian tribal status, it has given Hawaiians some, but not all, of the privileges that go with formal tribal status. Because resolving Plaintiffs' equal protection claims would require the court to determine Hawaiians' political status in order to determine the appropriate level of scrutiny, the court declined to decide Hawaiians' current political status "in recognition of the continuing debate in Congress" and the principle that "this is a political issue that should be first decided by another branch of government." *Arakaki VI*, 305 F. Supp. 2d at 1173.

Plaintiffs appeal the dismissal of all their claims.

## II.  STANDARD OF REVIEW

Standing is a legal issue subject to *de novo* review. *Bruce v. United States*, 759 F.2d 755, 758 (9th Cir. 1985). In ruling on a FED. R. CIV. P. 12(b)(6) motion to dismiss for lack of standing, we must construe the complaint in favor of the complaining party. *Hong Kong Supermarket v. Kizer*, 830 F.2d 1078, 1080-81 (9th Cir. 1987). As the district court noted, whether dismissal on political question grounds is jurisdictional or prudential in nature, and thus whether it is properly classified under Rule 12(b)(1) or 12(b)(6), is unclear. *Compare Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215 (1974) (presence of a political question, like absence of standing, deprives court of jurisdiction), *with Goldwater v. Carter*, 444 U.S. 996, 1000 (1979) ("the political-question doctrine rests in part on prudential concerns calling for mutual respect among the three branches of Government"). Either way, we review the district court's dismissal *de novo*. *See, e.g., Decker v. Advantage Fund, Ltd.*, 362 F.3d 593, 595-96 (9th Cir. 2004) (dismissal under Rule 12(b)(6) reviewed *de novo*); *Luong v. Circuit City Stores*,

*Inc.*, 368 F.3d 1109, 1111 n.2 (9th Cir. 2004) (dismissal for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), reviewed *de novo*).

## III. PLAINTIFFS' STANDING TO CHALLENGE THE DHHL/HHC LEASES

Plaintiffs claim standing to challenge the DHHL/HHC leases as land trust beneficiaries, and as state taxpayers. We find that neither theory confers standing to challenge the lease requirements or the appropriation of state revenue in support thereof. The district properly dismissed all claims against the DHHL/HHC and the United States.

### A.   *Plaintiffs' Standing as Land Trust Beneficiaries*

Plaintiffs challenge the public lands trust administered by DHHL/HHC because it prefers native Hawaiians in the lease eligibility criteria for the 200,000 acres set aside in the HHCA and incorporated into the Hawaii Constitution through the Admission Act. The Plaintiffs argue that as members of the class of "native Hawaiians and general public," HAW. CONST. art. XII, § 4, they are trust beneficiaries, and may sue the trustee when the trustee's actions violate the law. *See* RESTATEMENT (SECOND) OF TRUSTS §§ 166, 214. Plaintiffs allege that the trustees—including DHHL/HHC and the United States—have enforced the provisions of the trust in violation of the Fifth and Fourteenth Amendments.

### 1.   The United States as Trustee

Plaintiffs argue that the trust obligations of the United States arise through two acts, the Newlands Resolution and the Admission Act. Plaintiffs claim the trust was first established in 1898 by the Newlands Resolution with the United States as trustee. Congress, according to Plaintiffs, then violated its duties as trustee by discriminating on the basis of race when it enacted the HHCA in 1921 and again in the

Admission Act when it required Hawaii to incorporate the HHCA into its Constitution. Alternatively, Plaintiffs argue that the United States became a trustee as a result of the Admission Act.[1]

The history of the land trust does not support either of Plaintiffs' theories. The United States is not currently a trustee of the lands in question by virtue of either the Newlands Resolution or the Admission Act. The Newlands Resolution recited that the Government of the Republic of Hawaii ceded "the absolute fee and ownership of all public Government, or Crown lands." Newlands Resolution, 30 Stat. 750 (1898). It further provided that existing U.S. laws regarding public lands would not apply to Hawaiian lands, but that Congress "shall enact special laws for their management and disposition: *Provided*, That all revenue from or proceeds of the same . . . shall be used solely for the benefit of the inhabitants of the Hawaiian Islands for educational and other public purposes." *Id.* Although this passage did not specifically use the word "trust," the Attorney General of the United States subsequently interpreted it "to subject the public lands in Hawaii to a special trust." *Hawaii — Public Lands*, 22 Op. Att'y Gen. 574, 576 (1899).

Assuming, *arguendo*, that the Attorney General was right to construe the Newlands Resolution as establishing a trust, and assuming further that the United States became a trustee, the United States' status as trustee was expressly subject to future revision. The Resolution specifically provides that "the United States shall enact special laws for [the] management

---

[1] The district court concluded that Plaintiffs had waived the Newlands Resolution theory, and addressed only the Admission Act theory. *Arakaki II*, 299 F. Supp. 2d at 1101. Plaintiffs deny the waiver. However, this court can affirm the district court's dismissal on any ground supported by the record, even if the district court did not rely on the ground. *See, e.g., Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 950 (9th Cir. 2005). In the interest of being thorough, we therefore address both theories.

and disposition" of public lands. The Attorney General construed this provision as "vest[ing] in Congress the exclusive right, by special enactment, to provide for the disposition of public lands in Hawaii." *Id.* The Newlands Resolution thus contemplated that Congress would enact subsequent rules to govern the ceded lands.

[1] Congress enacted such rules in the HHCA and the Admission Act. Any trust obligation the United States assumed in the Newlands Resolution for the lands at issue here was extinguished by Congress when it created the DHHL/HHC in the HHCA and granted it control of defined "available lands." Act of July 9, 1921, ch. 42, §§ 202, 204, and 207; *see id.* § 204(a) ("Upon the passage of this Act, all available lands shall immediately assume the status of Hawaiian home lands and be under the control of the department to be used and disposed of in accordance with the provisions of this Act."). Any lingering doubt over the United States' role as trustee was eliminated entirely in the Admission Act when the United States "grant[ed] to the State of Hawaii, effective upon its admission in the Union, the United States' title to all the public lands and other public property, and to all lands defined as 'available lands' by section 203 of the Hawaiian Homes Commission Act . . . title which is held by the United States immediately prior to its admission into the Union." Pub. L. No. 86-3, § 5(b), 73 Stat. 4.

[2] Our discussion here also resolves Plaintiffs' claim that the Admission Act established the United States' obligations as a trustee. The Admission Act unambiguously requires that land be held in public trust, but by the State of Hawaii, not the United States. Nothing in the Admission Act suggests that the United States would serve as a co-trustee with the State. Nor does the fact that the United States must consent to changes in the qualifications of lessees under the trust make the United States a co-trustee. *See* Pub. L. No. 86-3, § 4, 73 Stat. 4. Congress might have made the United States a co-trustee; instead it reserved to the United States the right to bring suit for

breach of trust, *id.* § 5(f), a provision at odds with the suggestion that the United States remains a trustee. We conclude, as we noted in *Keaukaha-Penaewa Cmty. Ass'n v. Hawaiian Homes Comm'n*, 588 F.2d 1216, 1224 n.7 (9th Cir. 1978), that "[t]he United States has only a somewhat tangential supervisory role of the Admission Act, rather than the role of trustee."

2.    The United States as an Indispensable Party

Although the United States cannot be sued on Plaintiffs' trust beneficiary theory, Plaintiffs nevertheless argue that they may at least sue the state defendants on the same theory. Plaintiffs point to several cases in which we have held that native Hawaiians, as trust beneficiaries, could bring suit under 42 U.S.C. § 1983 against the State to enforce the terms of the trust. *E.g., Price v. Akaka*, 928 F.2d 824 (9th Cir. 1990); *Keaukaha-Panaewa Cmty. Ass'n v. Hawaiian Homes Comm'n*, 739 F.2d 1467 (9th Cir. 1984); *see also Price v. Akaka*, 3 F.3d 1220, 1223-25 (9th Cir. 1993). Those cases involved claims that the state was improperly administering the trust and sought to enforce the trust's terms.

We believe that this argument is disposed of easily. Those cases differ from the present challenge in a fundamental way: although those previous § 1983 cases have involved suits to enforce the express terms of the trust, this suit, by contrast, asks the court to prohibit the enforcement of a trust provision. That is, Plaintiffs now raise a § 1983 claim that is unique in that it does not seek to *enforce* the substantive terms of the trust, but instead challenges at least one of those terms as constitutionally *unenforceable.*

[3] We have recently held that in any challenge to the enforceability of the lease eligibility requirements, the United States is an indispensable party. In *Carroll v. Nakatani*, 342 F.3d 934 (9th Cir. 2003), a non-native Hawaiian citizen challenged the homestead lease program administered by DHHL/

HHC. The plaintiff sued the relevant state actors, but failed to sue the United States. We held that Section 4 of the Admissions Act "expressly reserves to the United States that no changes in the qualifications of the lessees may be made without its consent." *Carroll*, 342 F.3d at 944. We reasoned that because the qualifications for the DHHL/HHC leases cannot be modified without the United States' approval, the United States is an indispensable party to any lawsuit challenging the DHHL/HHC leases, and the Plaintiff's failure to sue the United States meant that his injury was not redressable. *Id.* at 944.

[4] Here, unlike in *Carroll*, Plaintiffs properly named the United States as a party. *Carroll*'s logic nonetheless applies. Plaintiffs lack standing to sue the United States, but the United States is an indispensable party to any challenge to the lease eligibility requirements. Plaintiffs therefore cannot maintain their challenge to the lease eligibility requirements against the State. Accordingly, the district court properly dismissed the Plaintiffs' trust beneficiary claim against the state defendants.

B.    *Plaintiffs' Standing As State Taxpayers*

Plaintiffs also challenge the DHHL/HHC lease eligibility programs in their capacity as state taxpayers. The question is whether our decision in *Carroll* bars Plaintiffs' equal protection challenge in their capacity as taxpayers, just as it barred Plaintiffs' suit in their capacity as trust beneficiaries. In particular, we must decide whether Plaintiffs have standing to challenge Hawaii's spending of tax revenues on the lease program.[2] This is a more complicated question.

---

[2]Plaintiffs do not limit their challenge to the expenditure of state tax revenues; instead, they challenge *all* state spending on the lease program, whether funded by taxes, bonds, the proceeds of a settlement, or other non-tax revenues. The district court held that, if Plaintiffs could bring their equal protection claims against DHHL/HHC based on their taxpayer status

The standing doctrine, like other Article III doctrines concerning justiciability, ensures that a plaintiff's claims arise in a "concrete factual context" appropriate to judicial resolution. *Valley Forge Christian Coll. v. Ams. United For Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). Standing ensures that, no matter the academic merits of the claim, the suit has been brought by a proper party. The " 'irreducible constitutional minimum of standing' " requires that a plaintiff allege that he has suffered concrete injury, that there is a causal connection between his injury and the conduct complained of, and that the injury will likely be redressed by a favorable decision. *United States v. Hays*, 515 U.S. 737, 742-43 (1995) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Plaintiffs have alleged that Hawaii has supported the lease program through tax revenues, a point that Hawaii does not dispute. *Arakaki* II, 299 F. Supp. 2d at 1098. Hawaii's taxing and spending in support of the lease program is not mandated by the Admission Act or any other federal law. The Admission Act requires Hawaii to adopt the HHCA and forbids Hawaii to change the lease eligibility requirement without the consent of the United States; but neither the Admission Act nor the HHCA, as incorporated by the Hawaii Constitution, mandates the expenditure of state funds, much less the expenditure of state tax revenues. Pub. L. No. 86-3, § 4, 73 Stat. 4. Section 5(f) of the Admission Act does provide that proceeds from the sale or other disposition of the lands shall be paid

---

at all, they could challenge only those avenues of state funding that actually derived from taxes, rather than from other sources. Because we conclude, like the district court, that *Carroll* precludes Plaintiffs' challenge to Hawaii's spending on the lease program regardless of the source of the state's funds, we need not decide here whether the district court correctly limited the scope of Plaintiffs' state taxpayer challenges. We limit our discussion to Plaintiffs' challenge to Hawaii's spending of tax revenues on the lease program and address the general question regarding the scope of standing as a state taxpayer in Part IV.A.3, *infra*.

into the trust for the identified purposes, but nothing suggests, much less requires, that the State of Hawaii expend tax revenues to support the lease program. Any tax revenues Hawaii has appropriated to DHHL/HHC, then, resulted from decisions by the Hawaii Legislature.

Plaintiffs' taxpayer-based claims might be construed as a limited challenge to the lease program: Plaintiffs challenge the lease program to the extent that Hawaii has—independent of any federal obligation, including the Admission Act— engaged in taxing and spending in support of the DHHL/HHC program. Under this theory, unlike their trust beneficiary theory, Plaintiffs would not challenge the lease eligibility requirements directly, nor would they implicate any substantial rights belonging to the United States. Thus, Plaintiffs might argue, even if they cannot seek to enjoin the native Hawaiians-only rule directly, they can seek to enjoin further state funding of a provision that allegedly violates the Equal Protection Clause. Plaintiffs' remedy, presumably, would be an injunction against spending state tax revenues, but not an order directing changes in the lease criteria.

[5] Plaintiffs' theory, though game, ultimately fails under *Carroll.* The only ground Plaintiffs have alleged for enjoining the state from spending is that the spending is for purposes prohibited by the Equal Protection Clause. Any remedy that Plaintiffs seek—for example, an injunction against expenditure of tax revenues for the lease program—demands that the district court decide whether the lease eligibility criteria are constitutional. The lease criteria are found in the HHCA which is adopted by Article XII of the Hawaii Constitution. We held in *Carroll,* however, that "Article XII of the Hawaiian Constitution cannot be declared unconstitutional without holding [Section 4] of the Admissions Act unconstitutional." *Carroll,* 342 F.3d at 944. Our decision in *Carroll* effectively holds that any challenge to Article XII is a challenge to Section 4 of the Admission Act, and no challenge to the Admis-

sion Act may proceed without the presence of the United
States as a defendant.

[6] As state taxpayers, Plaintiffs have no basis for suing the
United States. They claim no status that would distinguish
them from any number of other persons who also do not qual-
ify for the Hawaiian Home Lands leases. The Court has "re-
peatedly refused to recognize a generalized grievance against
allegedly illegal government conduct as sufficient for stand-
ing." *Hays*, 515 U.S. 743. Moreover, "[t]he rule against gen-
eralized grievances applies with as much force in the equal
protection context as in any other." *Id.; see Allen v. Wright*,
468 U.S. 737, 751 (1984). Federal taxpayer standing which,
notably, Plaintiffs do not assert, is simply one instance of the
assertion of a generalized grievance. *See Frothingham v. Mel-
lon*, 262 U.S. 447, 487-88 (1923) ("The administration of any
statute, likely to produce additional taxation to be imposed
upon a vast number of taxpayers, the extent of whose several
liability is indefinite and constantly changing, is essentially a
matter of public and not of individual concern.").

[7] We hold that Plaintiffs cannot avoid the implications of
*Carroll* by limiting their claims to state spending in support
of the lease program and then alleging their state taxpayer sta-
tus. Even if Plaintiffs were to have standing as state taxpayers
—a possibility we address in Part IV and hold is foreclosed
by the Supreme Court's decision in *DaimlerChrysler*—that
status cannot supply standing against the United States. *See,
e.g., Frothingham*, 262 U.S. at 486-87 (citing *Crampton v.
Zabriskie*, 101 U.S. 601, 609 (1880)); *W. Mining Council v.
Watt*, 643 F.2d 618, 631 (9th Cir. 1981). Accordingly, we
conclude that Plaintiffs lack standing to sue the United States,
and that the United States remains an indispensable party to
any challenge to the DHHL/HHC lease eligibility criteria. We
affirm the district court's dismissal of all claims against the
United States and DHHL/HHC.

## IV.  PLAINTIFFS' STANDING TO CHALLENGE OHA'S PROGRAMS

As with DHHL/HHC, Plaintiffs allege two theories of standing to challenge OHA: they challenge the appropriation of state tax revenue based on their status as state taxpayers, and they challenge the appropriation of trust revenue to OHA based on their alleged status as trust beneficiaries. Relying in large measure on our decision in *Hoohuli v. Ariyoshi*, 741 F.2d 1169 (9th Cir. 1984), the district court held that Plaintiffs had standing to sue OHA as state taxpayers. *Arakaki II*, 299 F. Supp. 2d at 1094-98. The court further held, however, that Plaintiffs lacked standing to challenge state funding of OHA that did not originate in taxes, specifically, any revenue that OHA received from lease rentals, settlements, or state bonds. *Id.* at 1100-01. With respect to the trust revenue claim, the district court dismissed the breach of trust claim on the ground that Plaintiffs had not pleaded a trust claim that was cognizable under the common law of trusts. *Id.* at 1103.

OHA contends that the district court must be reversed in light of *DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854 (2006), and because the United States is an indispensable party under *Carroll*. Plaintiffs allege that the district court erred by restricting the scope of their challenge to OHA programs directly funded by taxes. We address each of these contentions in turn. We conclude that *DaimlerChrysler* effectively overrules *Hoohuli*, and Plaintiffs, accordingly, do not have standing as state taxpayers to challenge the appropriation of state revenue to OHA. We need not reach the issue of whether or not the United States is an indispensable party under *Carroll*, nor need we discuss whether or not the district court properly limited the scope of Plaintiffs' challenge. Finally, we conclude, as we did in the prior section, that Plaintiffs cannot prevail on their trust beneficiary theory of standing because the United States remains an indispensable party to a suit challenging the trust, and Plaintiffs have no standing to sue the United States.

A. *Plaintiffs' State Taxpayer Standing*

1. The Vitality of *Hoohuli*

[8] In *Hoohuli*, residents of Hawaii and a taxpayers' group brought suit under 42 U.S.C. § 1983 for damages and injunctive relief to challenge programs administered by OHA to the extent those programs favored "Hawaiians." 741 F.2d at 1172. We held that at least some of the individual plaintiffs had standing to seek an injunction prohibiting the "appropriating, transferring, and spending" of taxpayers' money from the state treasury's general fund. *Id.* at 1180. The plaintiffs alleged that they had "been burdened with the necessity to provide more taxes to support [a class composed of Hawaiians]" and that this was sufficient to sustain a "good-faith pocketbook action set forth in *Doremus* [*v. Board of Education*, 342 U.S. 429, 434 (1952)]." *Id.* (internal quotations omitted). In our original opinion, we held that *Hoohuli* remained the law of the circuit, and that Justice Kennedy's opinion in *ASARCO v. Kadish*, 490 U.S. 605 (1989), while persuasive, did not receive the requisite five votes to overrule *Hoohuli*. *See Arakaki*, 423 F.3d at 967-69. Since we issued our original opinion, the Supreme Court decided *Daimler-Chrysler*, 126 S. Ct. 1854, which now effectively overrules *Hoohuli*. *See id.* at 1864 & n.4 (noting that *Arakaki* and *Hoohuli* were inconsistent with the five circuits to have decided this issue and agreeing with those circuits).

In order to satisfy the case or controversy requirement of Article III, a plaintiff must demonstrate an injury in fact, a causal relationship between the injury and the conduct complained of, and redressability. *Lujan*, 504 U.S. at 560. In taxpayer suits, these requirements are particularly difficult to satisfy. The Court has hesitated to recognize federal taxpayer standing because an injunction prohibiting spending on any given program may only remotely affect the parties' tax bill and redress the alleged injury. As the Court wrote in *Frothingham v. Mellon*, a federal taxpayer's "interest in the moneys

of the Treasury . . . is shared with millions of others . . . and the effect upon future taxation, of any payment out of the funds, is so remote, fluctuating and uncertain, that no basis is afforded for [judicial review]." 262 U.S. at 487.

The Court re-articulated this view in *DaimlerChrysler*, in which the plaintiffs alleged that a state tax credit violated the Commerce Clause. Plaintiffs claimed standing by virtue of their status as Ohio taxpayers, alleging that the franchise tax credit provided to DaimlerChrysler "depletes the funds of the State of Ohio to which the Plaintiffs contribute through their tax payments and thus diminishes the total funds available for lawful uses and imposes disproportionate burdens on them." 126 S. Ct. at 1862 (internal quotations and brackets omitted).

The Court held that plaintiffs did not have standing because their injury as taxpayers was not "concrete and particularized but instead a grievance the taxpayer suffers in some indefinite way in common with people generally." *Id.* (citation and internal quotations omitted). The injury was " 'conjectural or hypothetical' in that it depends on how legislators respond to a reduction in revenue, if that is the consequence of the credit." *Id.* "[E]stablishing redressability," the Court held, "requires speculating that abolishing the challenged credit will redound to the benefit of the taxpayer because legislators will pass along the supposed increased revenue in the form of tax reductions." *Id.* at 1863. According to the Court, the limitations on standing in federal taxpayer cases "applied with undiminished force to state taxpayers." *Id.*

*DaimlerChrysler* plainly undermines *Hoohuli*'s standing principles. Under *Hoohuli*, plaintiffs had to meet a three-part test for state taxpayer standing: (1) taxpayer status, (2) the funds in question were appropriated from the state's general funds, and (3) the state was spending the funds for an unlawful purpose. 741 F.2d at 1180. We did not require that the taxpayer prove that his tax burden would be lightened by the cancellation of the challenged expenditure. *See also Cammack*

*v. Waihee*, 932 F.2d 765, 769 (9th Cir. 1991) (noting that "*Hoohuli*, the leading case on this issue in the circuit, does not require that the taxpayer prove that her tax burden will be lightened by elimination of the questioned expenditure").

**[9]** *DaimlerChrysler*, by contrast, requires that state taxpayers establish a particularized, concrete injury that is redressable by the court's judgment. As the Supreme Court observed, the Plaintiffs' alleged injury is speculative if redress ultimately depends on how the legislature responds to the court's judgment. *See DaimlerChrysler*, 126 S. Ct. at 1862-63. But the "[f]ederal courts may not assume a particulate exercise of . . . state fiscal discretion in establishing standing." *Id.* at 1864. The Court concluded that "state taxpayers have no standing under Article III to challenge state tax or spending decisions simply by virtue of their status as taxpayers." *Id.* at 1864 (footnotes omitted).

2.    Application of *DaimlerChrysler*

Applying the reasoning of *DaimlerChrysler* to the facts of the case at hand, we conclude that Plaintiffs do not have standing as state taxpayers to challenge the appropriation of state revenue to OHA. Plaintiffs argue that they meet the test for standing under *DaimlerChrysler* because (1) their injury is concrete and particularized, (2) the depletion of the state treasury is actual and ongoing, and (3) the injury they suffer is redressable through declaratory and injunctive relief. We address each contention in turn.

**[10]** First, Plaintiffs maintain that because they "are required to pay taxes to support racial discrimination against themselves," they suffer a particularized injury that "is not shared by people in general or by Hawaii state taxpayers generally, but only by [taxpayers] . . . who lack the favored [native-Hawaiian] ancestry" and benefit from OHA programs. But Plaintiffs do not allege that they have suffered any harm apart from the fact that they are taxpayers and do not like

OHA's programs. Plaintiffs' argument, taken to its logical conclusion, would significantly expand state taxpayer Article III standing by allowing a taxpayer to challenge any governmental expenditure he does not like and for which he has not applied: Expenditures from the common fisc for veteran's benefits could be challenged by any taxpayer who had not served in the military; welfare benefits could be challenged by any individual not on welfare; educational expenditures could be invalidated by a suit brought by an individual who does not have children in the public school system. Under Plaintiffs' theory, even the Ohio taxpayers in *DaimlerChrysler* could argue that while all Ohio taxpayers bore the burden of the depletion of funds from the fisc, taxpayers who were employed by DaimlerChrysler received a benefit in the form of a paycheck and thus a taxpaying non-employee suffers a particularized injury. We think that the Court's reasoning in *DaimlerChrysler* extends to such creative arguments. As the Court noted, conferring standing on state taxpayers "simply because their tax burden gives them an interest in the state treasury would interpose the federal courts as virtually continuing monitors of the wisdom and soundness of state fiscal administration, contrary to the more modest role Article III envisions for federal courts." *DaimlerChrysler*, 126 S. Ct. at 1864 (internal quotations omitted). We decline to play such a role and accordingly reject Plaintiffs' contention that they suffer a particularized injury.

[11] Second, Plaintiffs assert the injury they suffer is "actual, imminent and ongoing" as the State Legislature continues to appropriate sums from the General Fund for OHA. They contrast this with the Supreme Court holding in *DaimlerChrysler*, which they characterize as involving a tax rebate that was a "conjectural" depletion of the state treasury. However, the plaintifs misapprehend what we look to when determining whether the injury is "conjectural or hypothetical." As the Supreme Court noted, a plaintiff's injury is "conjectural or hypothetical" when it "depends on how legislators respond" to a change in revenue. *DaimlerChrysler*, 126 S. Ct.

at 1862. Plaintiffs here overlook the fact that whether or not their injury is redressable is entirely speculative. It is not certain that even if all funding for OHA were terminated, that the Legislature would pass the savings on to the Plaintiffs in the form of tax breaks or refrain from spending the funds on programs benefitting yet another subgroup of the Hawaiian population to which Plaintiffs do not belong. The flow of funds from the treasury to support OHA is actual and concrete; what the Legislature would do with those funds absent OHA is speculative.

[12] Third, Plaintiffs assert that their injury is redressable through declaratory or injunctive relief. For the reasons stated above, any benefit that would accrue to Plaintiffs from an injunction or declaratory judgement is speculative. Plaintiffs argue that the Supreme Court has allowed individuals who can allege a distinct and palpable injury to themselves to sue and invoke the public interest even if the injury is shared by a large class of other potential litigants. However, these cases are readily distinguishable and involved core functions of our democracy, such as voting, *see Baker v. Carr*, 369 U.S. 186 (1962) (involving a justiciable question of voting district apportionment); *see Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966) (striking down a poll tax), or issues of economic liberty outside the taxation context, *see McGowan v. Maryland*, 366 U.S. 420 (1961) (involving harm from economic loss and fines from Sunday Closing Laws). The Court has consistently denied both federal and state taxpayers standing under Article III to object to a particular expenditure of funds simply because they are taxpayers. *See, e.g., Valley Forge*, 454 U.S. 464 (denying standing to taxpayers to challenge conveyance of government land to a private religious college); *Reservists Comm.*, 418 U.S. 208 (denying taxpayers standing to challenge members of Congress' membership in armed forces reserve units); *United States v. Richardson*, 418 U.S. 166 (1974) (denying taxpayer standing to force publication of the receipts and expenditures of the CIA); *Doremus v. Bd. of Educ.*, 342 U.S. 429 (1952) (holding that the rationales

for rejecting federal taxpayer standing apply with equal force
to state taxpayer suits); *Ala. Power Co. v. Ickes*, 302 U.S. 464,
478 (1938) (holding that "the interest of a taxpayer in the
moneys of the federal treasury furnishes no basis" to argue
that a federal agency's practices are unconstitutional). The
Court has allowed some Establishment Clause challenges to
federal spending to go forward, but this is a narrow exception,
not the rule. The Court has declined to extend this exception
to other areas. *See, e.g., DaimlerChrysler*, 126 S. Ct. at 1864-
65; *Bowen v. Kendrick*, 487 U.S. 589, 618 (1988) ("Although
we have considered the problem of standing and Article III
limitations on federal jurisdiction many times since [*Flast*],
we have consistently adhered to *Flast* and the narrow excep-
tion it created to the general rule against taxpayer standing
. . . ."); *Flast v. Cohen*, 392 U.S. 83 (1968) (creating an
exception for Establishment Clause challenges to the general
standing bar for taxpayer suits).

[13] In sum, we hold that these "state taxpayers have no
standing under Article III to challenge [Hawaii] state tax or
spending decision simply by virtue of their status as taxpay-
ers." *DaimlerChrysler*, 126 S. Ct. at 1864. Although it
appears to us that there are no plaintiffs who have standing to
challenge the OHA funding, we are unwilling to make that
final judgment on this record before us. Accordingly, we
remand to the district court for further proceedings.

3.   The United States as an Indispensable Party

OHA argues that even if Plaintiffs have taxpayer standing,
under *Carroll* the United States is also an indispensable party
to any equal protection challenge to its programs. The district
court rejected the argument on the ground that DHHL/HHC
and OHA have distinct origins. In contrast to DHHL/HHC,
"[n]othing in the Admission Act requires the creation of OHA
or governs OHA's actions." *Arakaki IV*, 299 F. Supp. 2d at
1127.

[14] The district court is correct with respect to OHA's expenditure of tax revenue. OHA was created nearly twenty years after Hawaii's admission to the union. In 1978, Hawaii amended its Constitution to add Sections 5 and 6—creating OHA and defining its duties—to Article XII. *See* HAW. CONST. art. XII, §§ 5-6. The Constitution does not provide for OHA's funding, which is provided by statute. *See, e.g.*, HAW. REV. STAT. §§ 10-3(1) ("A pro rata portion of all funds derived from the public land trust shall be funded in an amount to be determined by the legislature."), 10-13.5 ("Twenty per cent of all funds derived from the public land trust . . . shall be expended by [OHA] . . . ."). Unlike the lease eligibility requirement imposed by the HHCA and administered by DHHL/HHC, the United States has no right to consent or withhold consent to the creation of OHA or its administration of programs for native Hawaiians or Hawaiians. Because Plaintiffs can prevail against OHA "without holding [Section 4] of the Admissions Act unconstitutional," nothing "requires the participation of . . . the United States." *Carroll*, 342 F.3d at 944. We decline to extend *Carroll* to claims against OHA concerning tax revenue.

## B.   *Plaintiffs' Trust Beneficiary Standing*

[15] Plaintiffs allege, as an independent basis for standing, that as trust beneficiaries they may sue OHA because OHA receives trust revenues. Although the United States is not an indispensable party to a challenge to the appropriation of *tax* revenue, *see* Part IV.A.3, *supra*, this is not true with respect to OHA's receipt of *trust* revenue. We have previously held that the expenditure of trust revenue is governed by the Admission Act. *Price v. Akaka*, 928 F.2d 824, 827 (9th Cir. 1990). Any challenge to the expenditure of trust revenue brought by alleged trust beneficiaries must challenge the substantive terms of the trust, which are found in the Admission Act. For the reasons we explained in Part III.A.2, *supra*, the United States is an indispensable party to any challenge to the Admission Act. Accordingly, although the United States is

not an indispensable party with respect to challenges to OHA's expenditure of *tax* revenue, it remains indispensable with respect to challenges to the expenditure of *trust* revenue.

[16] Plaintiffs' attempt to challenge OHA's expenditure of trust revenue thus suffers from the same fatal flaw as its challenge to the DHHL/HHC lease eligibility requirements. The United States is an indispensable party to the challenge to the expenditure of trust revenue, and yet Plaintiffs cannot establish standing to sue the United States either as taxpayers or as trust beneficiaries. *See* Parts III.A.2 and III.B., *supra*. Plaintiffs therefore cannot proceed with that claim. We do not reach the issue whether Plaintiffs' breach of trust claim is otherwise cognizable under the common law of trusts, which was the basis of the district court's dismissal of the breach of trust claim against OHA. Rather, we affirm the dismissal on the alternative ground that Plaintiffs cannot demonstrate standing to sue an indispensable party.

## V.   POLITICAL QUESTION

The final question is whether, assuming any Plaintiffs have standing to bring a cause of action against the state defendants, that cause of action presents a nonjusticiable political question. The district court reasoned that in order to rule on Plaintiffs' equal protection claims, the court would have to determine what level of scrutiny to apply. *Compare Grutter v. Bollinger*, 539 U.S. 306, 328-33 (2003) (applying strict scrutiny to uphold race-conscious admissions policy at state university law school), *and Gratz v. Bollinger*, 539 U.S. 244, 270-75 (2003) (striking down race-conscious undergraduate admissions policy at state university under strict scrutiny), *with Morton v. Mancari*, 417 U.S. 535 (1974) (applying rational basis, rather than strict scrutiny, to employment preference that benefitted members of Indian tribe because it furthered Indian self-government), *and Alaska Chapter, Associated Gen. Contractors of Am., Inc. v. Pierce*, 694 F.2d 1162 (9th Cir. 1982) (applying rational basis test to native Alaskans

based on the federal government's "special obligation" to Indians). The district court reasoned that although Congress has plenary authority over Indian affairs, it "has not yet clearly recognized Hawaiians as being equivalent to Indians or Indian tribes for purposes of the [*Mancari*] analysis." *Arakaki VI*, 305 F. Supp. 2d at 1172. Noting that "Congress has begun to include Hawaiians as beneficiaries in bills providing services to Native Americans" and had pending before it the "Akaka Bill" that would "equate Hawaiians to Indians and/or Indian tribes," the court observed that "Congress is still speaking on the issue." *Id.* at 1173. The district court concluded that Congress "should make the decision as to whether Hawaiians should be treated as Indians for purposes of the [*Mancari*] analysis" and, "in recognition of the continuing debate," the court would "defer[ ] to Congress." *Id.* at 1173, 1174. We hold that these claims do not raise a nonjusticiable political question. We therefore reverse the district court's dismissal on political question grounds.

Chief Justice Marshall explained in *Marbury* that "[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803). The Court announced the modern formulation of the political question doctrine in *Baker v. Carr*:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for

unquestioning adherence to a political decision
already made; or [6] the potentiality of embarrass-
ment from multifarious pronouncements by various
departments on one question.

369 U.S. 186, 217 (1962); *see Alperin v. Vatican Bank*, 410
F.3d 532, 537-40 (9th Cir. 2005), *cert. denied*, 126 S. Ct.
1141 *and* 126 S. Ct. 1160 (2006); *EEOC v. Peabody W. Coal
Co.*, 400 F.3d 774, 784 (9th Cir. 2005), *cert. denied*, 126
S. Ct. 1164 (2006); *Kahawaiolaa v. Norton*, 386 F.3d 1271,
1275 (9th Cir. 2004).

[17] We have recently addressed the political question doc-
trine in the context of a challenge to the executive's failure to
recognize Hawaiians as federal Indian tribes in *Kahawaiolaa*,
386 F.3d 1271. In that case, native Hawaiians alleged that the
Department of Interior had violated the equal protection com-
ponent of the Fifth Amendment in regulations limiting recog-
nition of new tribes to " 'those American Indian groups
indigenous to the continental United States' "—which meant
that "native Hawaiians are excluded from eligibility to peti-
tion for tribal recognition under the regulations." *Id.* at 1274
(quoting 25 C.F.R. § 83.3(a)). The district court dismissed the
suit against the Department of Interior, in part because matters
of tribal recognition raise nonjusticiable political questions.
We disagreed with the district court on this point. We noted
that "[i]f the question before us were whether a remedy would
lie against Congress to compel tribal recognition, the answer
would be readily apparent. . . . a suit that sought to direct
Congress to federally recognize an Indian tribe would be non-
justiciable as a political question." *Id.* at 1275-76. We found,
however, that the plaintiffs did not seek tribal recognition;
rather, they wanted the Department of Interior to allow them
to apply for recognition "under the same regulatory criteria
applied to indigenous peoples in other states." *Id.* at 1276. We
concluded that the plaintiffs' suit was not barred by the politi-
cal question doctrine.

In order to stay our hand in this case, we must determine that the resolution of Plaintiffs' equal protection claims against OHA would interfere with the constitutional duties of one of the political branches, whether that duty has been exercised or not. The district court and the state defendants locate that "textually demonstrable constitutional commitment of the issue" in Article I, Section 8, Clause 3 of the U.S. Constitution: "The Congress shall have Power . . . To regulate Commerce . . . with the Indian Tribes." The Court has observed that "Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights." *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 343 (1998). Thus, the "questions whether, to what extent, and for what time [Indians] shall be recognized and dealt with as dependent tribes requiring the guardianship and protection of the United States are to be determined by Congress, and not by the courts." *United States v. Sandoval*, 231 U.S. 28, 46 (1913).

Here, no party seeks to *compel* Congress to recognize the tribal status of Hawaiians. Instead, OHA argues that *if* Congress has treated Hawaiians as a tribe, then under the authority of *Mancari*, OHA would have to demonstrate only a rational connection between its Hawaiian preferences and its programs. Plaintiffs argue that Congress' failure, so far, to recognize Hawaiians' tribal status does not *prevent* the courts from deciding whether OHA's Hawaiian-preference violates the Equal Protection Clause of the Fourteenth Amendment. Effectively, the district court found that it could not rule on the equal protection claim until it could determine the appropriate level of scrutiny, and it could not determine the level of scrutiny until Congress decided to grant or not to grant tribal status to Hawaiians.

[18] Nothing in the claims Plaintiffs have asserted or the remedy they seek invites the district court to exercise powers reserved to Congress or to the President. The district court has not been asked to declare tribal status where Congress has

declined. Instead, it is asked to interpret the implications of past congressional action or inaction for equal protection analysis. Indeed, courts are frequently called upon to "scrutiniz[e] Indian legislation to determine whether it violates . . . equal protection." *Del. Tribal Bus. Comm. v. Weeks*, 430 U.S. 73, 84 (1977). The fact that Congress enjoys "plenary power . . . in matters of Indian affairs 'does not mean that all federal legislation concerning Indians is . . . immune from judicial scrutiny.' " *Id.* at 83-84 (quoting Brief of the Secretary of the Interior). In general, "the political question doctrine does not bar adjudication of a facial constitutional challenge even though Congress has plenary authority, and the executive has broad delegation, over Indian affairs." *Kahawaiolaa*, 386 F.3d at 1276.

In the exercise of its power to regulate commerce with Indians and recognize their sovereign status, Congress might be able to alter the relative burdens of proof and persuasion shouldered by Plaintiffs and OHA in this case.[3] But Congress has no obligation to exercise its Article I, Section 8, Clause 3 powers in any particular way. That it has, so far, declined to do so does not excuse the district court from hearing the case. Congress does not have a constitutionally committed power to set the level of scrutiny for those claiming native American status; it has the constitutionally committed authority to regulate affairs with native Americans, and the courts then determine which level of scrutiny is warranted by Congress' action or inaction. *See, e.g., Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g*, 476 U.S. 877, 882 (1986); *United States v. Antelope*, 430 U.S. 641, 645-46 (1977); *Mancari*, 417 U.S. at 553 n.24.

---

[3]We couch this in the conditional because the Court in *Rice* suggested that it remains "a matter of some dispute . . . whether Congress may treat the native Hawaiians as it does the Indian tribes." 528 U.S. at 518. Like the Court, "[w]e can stay far off that difficult terrain" in this appeal. *Id.* at 519.

Moreover, we note that even if Congress had treated Hawaiians or native Hawaiians as a tribe, the district court would still have to determine whether OHA's classification was based on race or on tribal status. As we observed in *Kahawaiolaa*:

> As *Rice* illustrates, an "Indian tribe" may be classified as a "racial group" in particular instances . . . . We reject the notion that distinctions based on Indian or tribal status can never be racial classifications subject to strict scrutiny. . . . Government discrimination against Indians based on race or national origin and not on membership or non-membership in tribal groups can be race discrimination subject to strict scrutiny.

386 F.3d at 1279 (citing *Adarand Constructors v. Pena*, 515 U.S. 200, 227 (1995)). This, too, is a determination properly left to the courts. *Id.*

[19] Assuming that some Plaintiffs have standing, Plaintiffs' claims squarely and exclusively raise a Fourteenth Amendment claim. The courts must therefore determine the proper level of scrutiny. We do not require further action by Congress to inform that determination. To deny the federal courts their authority to adjudicate an equal protection claim simply because Congress expressed its intent with less than complete lucidity is to expand the political question doctrine beyond its historical limits. In doing so, it would restrict judicial authority in unprecedented ways; such an expansive interpretation subverts the very separation of powers that the political question doctrine is designed to protect. Although the Supreme Court was able to postpone consideration of those equal protection questions of "considerable moment and difficulty," *Rice*, 528 U.S. at 518-19, we do not have that luxury.

## VI.  PLAINTIFFS' REMAINING MISCELLANEOUS ARGUMENTS

Plaintiffs make several additional arguments on appeal, none of which is meritorious. Plaintiffs contend that the district court erred in striking its Counter Motion for Summary Judgment of December 15, 2003. The district court cited multiple grounds in its December 16, 2003 unpublished Order for striking the motion, including: the motion was not a true counter motion because it raised numerous issues not raised in the motion which it purportedly countered; it was untimely; and the motion was not filed in the proper round of summary judgment rounds, as scheduled by the district court in a previous order.

[20] We review for abuse of discretion challenges to pretrial management. *Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir. 2001). "The district court is given broad discretion in supervising the pretrial phase of litigation." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607 (9th Cir. 1992) (citation and internal quotation marks omitted). Plaintiffs have not demonstrated that the district court's management of the summary judgment phase of this trial constituted an abuse of discretion. The district court's December 16, 2003 Order is affirmed. Similarly, we are unpersuaded by Plaintiffs' contention that the district court's pretrial management warrants the reassignment of this case to another judge and their request is denied.

[21] Plaintiffs also appeal the district court's May 5, 2004 unpublished Order awarding roughly $5300 in costs to select defendants on the ground that imposing such costs will have a "chilling effect" on civil rights litigation. We review an award of costs for abuse of discretion. *Evanow v. M/V Neptune*, 163 F.3d 1108, 1113 (9th Cir. 1998). Plaintiffs have not demonstrated that the award of such modest costs, divided among multiple plaintiffs, constitutes an abuse of discretion. The district court's May 5, 2004 Order is affirmed.

[22] Finally, Plaintiffs seek reversal of the district court's January 26, 2004 unpublished Order denying Plaintiffs' motion to compel discovery. A district court's discovery rulings are reviewed for an abuse of discretion. *United States v. Fisher*, 137 F.3d 1158, 1165 (9th Cir. 1998). Again, we find no abuse of discretion, and the order is affirmed.

## VII.   CONCLUSION

The district court's orders are variously affirmed or reversed as follows.

*Arakaki* I, 198 F. Supp. 2d 1165 (D. Haw. 2002), is affirmed in part and reversed in part. We reverse the court's holding that Plaintiffs have standing to challenge the appropriation of state tax revenue to OHA. We reverse the holding that Plaintiffs have standing as taxpayers to challenge the appropriation of tax revenue to DHHL/HHC. We affirm the denial of standing to challenge the settlement of past claims against OHA. We affirm the denial of standing to challenge the issuance of bonds and the denial of standing to challenge all other spending that does not originate in tax revenue. The remaining issues addressed in that order are not on appeal.

*Arakaki* II, 299 F. Supp. 2d 1090 (D. Haw. 2002), is affirmed in part and reversed in part. We reverse Plaintiffs' standing to challenge the appropriation of state tax revenue to the OHA. We reverse the grant of standing to challenge the appropriation of tax revenue to DHHL/HHC. We affirm the denial of standing to sue as trust beneficiaries. We affirm the denial of the motion to dismiss the tax revenue claim against OHA under the political question doctrine. We reverse the denial of the motion to dismiss the tax revenue claim against DHHL/HHC. The remaining issues in that order are not on appeal.

*Arakaki* III, 299 F. Supp. 2d 1107 (D. Haw. 2002), is affirmed on different grounds. *Arakaki* IV, 299 F. Supp. 2d

1114 (D. Haw. 2003), and *Arakaki* V, 299 F. Supp. 2d 1129 (D. Haw. 2003), are affirmed. *Arakaki* VI, 305 F. Supp. 2d 1161 (D. Haw. 2004), is reversed. All remaining orders in this case are affirmed.

The parties shall bear their own costs on appeal.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**