H. WILLIAM BURGESS #833
2299C Round Top Drive
Honolulu, Hawai`i 96822
Telephone: (808) 947-3234
Fax:          (808) 947-5822
Email: hwburgess@hawaii.rr.com

Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| EARL F. ARAKAKI, EVELYN C. ARAKAKI, EDWARD U. BUGARIN, SANDRA PUANANI BURGESS, PATRICIA CARROLL, ROBERT M. CHAPMAN, JOHN M. CORBOY, MICHAEL Y. GARCIA, TOBY M. KRAVET, JAMES I. KUROIWA, JR., FRANCES M. NICHOLS, DONNA MALIA SCAFF, JACK H. SCAFF,  GARRY P. SMITH, THURSTON TWIGG-SMITH, JAMES S. WARSON <br><br> Plaintiffs, <br> v. <br><br> LINDA LINGLE in her official capacity as GOVERNOR OF THE STATE OF HAWAII; GEORGINA K. KAWAMURA in her official capacity as DIRECTOR OF THE DEPARTMENT OF BUDGET AND FINANCE; RUSS K. SAITO in his official capacity as STATE COMPTROLLER, and DIRECTOR OF THE DEPARTMENT OF ACCOUNTING AND GENERAL SERVICES;  PETER YOUNG in his official capacity as CHAIRMAN OF THE BOARD OF LAND AND NATURAL RESOURCES; SANDRA LEE KUNIMOTO, in her official capacity as CHAIRPERSON OF THE | CIVIL NO. 02-00139 SOM/KSC <br><br> AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT <br><br> (RE: CONSTITUTIONALITY OF OFFICE OF HAWAIIAN AFFAIRS, HAWAIIAN HOMES COMMISSION AND RELATED LAWS) <br><br> AND FOR AN INJUNCTION; <br><br> APPENDIX <br> *KAPU* TO WE THE PEOPLE TO … <br> *KAPU* AGAIN? |

# EXHIBIT A

AND TOURISM; BARRY FUKUNAGA in                )
his official capacity as INTERIM DIRECTOR      )
OF THE DEPARTMENT OF                           )
TRANSPORTATION,                                )
                                               )
       State Defendants,                     )
                                               )
MUFI HANNEMANN, in his official                )
capacity as MAYOR OF THE CITY AND              )
COUNTY OF HONOLULU; MARY                       )
PATRICIA WATERHOUSE, in her official           )
capacity as DIRECTOR OF THE BUDGET             )
AND FISCAL SERVICES DEPARTMENT                 )
OF THE CITY AND COUNTY OF                      )
HONOLULU; HARRY KIM, in his official           )
capacity as MAYOR OF THE COUNTY OF             )
HAWAII; WILLIAM TAKABA in his                  )
official capacity as the DIRECTOR OF THE       )
DEPARTMENT OF FINANCE FOR THE                  )
COUNTY OF HAWAII; CHARMAINE                    )
TAVARES, in her official capacity as the       )
MAYOR OF THE COUNTY OF MAUI;                   )
KALBERT K. YOUNG, in his official              )
capacity as DIRECTOR OF THE                    )
DEPARTMENT OF FINANCE FOR THE                  )
COUNTY OF MAUI; BRYAN J.                       )
BAPTISTE, in his official capacity as the      )
MAYOR OF THE COUNTY OF KAUAI;                  )
WALLACE G. REZENTES, JR., in his               )
official capacity as the FINANCE               )
DIRECTOR FOR THE COUNTY OF                     )
KAUAI,                                         )
                                               )
       County Defendants,                    )
                                               )
HAUNANI APOLIONA, Chairman, and                )
ROWENA AKANA, DONALD B.                        )
CATALUNA, WALTER M. HEEN,                      )
ROBERT K. LINDSEY, COLETTE Y.P.                )
MACHADO, BOYD P. MOSSMAN,                      )
OSWALD STENDER, and JOHN D.                    )
WAIHE=E, IV in their official capacities as    )
trustees of the Office of Hawaiian Affairs,    )
                                               )
       OHA Defendants,                       )
                                               )

MICAH A. KANE, Chairman, and BILLIE                  )
ILIMA BACLIG, DONALD S.M. CHANG,                     )
STUART KEAHIAHI HANCHETT, MALIA                      )
PATRICE KAMAKA, FRANCIS KAHOU                        )
LUM, MAHINA MARTIN, TRISH                            )
MORIKAWA, MILTON PA, in their official               )
capacities as members of the Hawaiian Homes          )
Commission;                                          )
                                                     )
            HHCA/DHHL Defendants                     )
                                                     )
THE UNITED STATES OF AMERICA;                        )
DIRK KEMPTHORNE, in his official                     )
capacity as SECRETARY OF THE U.S.                    )
DEPARTMENT OF THE INTERIOR;                          )
ALPHONSO JACKSON, in his official                    )
capacity as SECRETARY OF THE UNITED                  )
STATES  DEPARTMENT OF HOUSING                        )
AND URBAN DEVELOPMENT,                               )
                                                     )
            FEDERAL Defendants                       )
                                                     )
                and                                  )
                                                     )
JOHN DOE DEFENDANTS 1 through 10.                    )
_____        )

Caption 7-0430

**AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT (RE: CONSTITUTIONALITY OF HHCA AND OHA AND RELATED FEDERAL, STATE AND COUNTY LAWS) AND FOR AN INJUNCTION**

<u>Nature of the Action</u>

1.      This is a class action brought under 42 U.S.C. §1983 for violations and threatened violations of the rights of Plaintiffs and the classes they represent to the equal protection of the laws under the Fifth and Fourteenth Amendments to the United States Constitution, and for racial discrimination in violation of 42 U.S.C. §§1985(3), 1986 and 2000d et seq, and for violation of the Ceded Lands Trust (sometimes referred to as the Public Land Trust) created under federal law in 1898.

As used in this complaint, "HHCA" means the Hawaiian Homes Commission Act; "DHHL" means the Department of Hawaiian Home Lands; and "OHA" means the Office of Hawaiian Affairs.

<u>Jurisdiction and Venue</u>

2.      Jurisdiction is invoked pursuant to 28 U.S.C. §1331 (federal question), §§1343(3) and 1343(4) (civil rights).

3.      Venue is in this judicial district pursuant to 28 U.S.C. §1391(b) because the acts giving rise to this action occurred and will occur in this district and the property that is the subject of this action is situated in this district.

<u>Plaintiffs</u>

4.      All plaintiffs are citizens, registered voters, and taxpayers of the United States, the State of Hawaii and the counties in which each resides.  Plaintiff John M. Corboy owns real property in the County of Maui.  Plaintiff James Warson owns real property in the County of Hawaii.  Plaintiff ***** owns real property in the County of

Kauai. Each of the other Plaintiffs owns real property in the City and County of Honolulu.

5.    Each plaintiff is a beneficiary of the Ceded Lands Trust created in 1898 when the public lands of the Republic of Hawaii were ceded to the United States, and accepted by the United States, with the requirement that all revenues or proceeds, with certain exceptions, "shall be used solely for the benefit of the inhabitants of the Hawaiian Islands for educational and other public purposes.

6.    Every plaintiff has:

a.    Applied to but not received from the county where he or she owns real property, exemption from real property taxes equivalent to the exemption given to Hawaiian Homestead lessees;

b.    Applied for but not received from the State of Hawaii and the United States, concurrent disbursements of public money and allocations of public lands, benefits, privileges and immunities equivalent to those given exclusively for "native Hawaiians" (anyone with not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778) or "Hawaiians" (anyone with at least one drop of such ancestry); and

c.    Requested but not received from the State of Hawaii or the United States impartial treatment equivalent to that accorded "native Hawaiian" beneficiaries in the administration of the Ceded Lands Trust.

<u>Class Action Allegations</u>

7.    Plaintiffs bring this suit as a class action pursuant to Rules 23(a), 23(b) and 23(c)(4)(B) of the Federal Rules of Civil Procedure on behalf of:

2

a.    A class consisting of all residents of Hawaii with less than 50% or no Hawaiian ancestry (the "**Class**");

b.    A subclass consisting of all residents of Hawaii with no Hawaiian ancestry (the "**Subclass**"); and

c.    Four additional "**Municipal" subclasses**, each consisting of all real property taxpayers in one of the four counties: Honolulu, Hawaii, Maui and Kauai who are not Hawaiian Homestead lessees or eligible to be.

8.    **The Class,** numbers and prorata entitlements. Based on Census 2000 and the assumption of about 30,000 "native Hawaiian" residents (50% or more blood), as reportedly estimated recently by a prominent HHCA/DHHL Defendant, Plaintiffs estimate the Class has about 1,180,500 members.

9.    Since "native Hawaiians" (50% or more Hawaiian ancestry) make up less than 5% of the State of Hawaii population, for every dollar going exclusively for "native Hawaiians", in order to comply with the Constitution's promise of Equal Protection of the laws to every person, nineteen dollars should be, distributed or allocated exclusively to or for plaintiffs and the other members of the Class (Hawaii residents with less than 50% or no Hawaiian ancestry).

10.    Plaintiffs do not advocate "separate but equal". Their preference would be for all governmental actors, federal, state and local, to stop treating people differently on the basis of race, color, ethnicity or national origin. However, for so long as federal, state or local governments treat people differently on the basis of race by disbursing or allocating public moneys, lands, privileges or immunities (including tax exemptions) exclusively for native Hawaiians or Hawaiians residing in Hawaii, Equal Protection of

3

the laws for every person requires comparable disbursements and allocations to or for every other person residing in Hawaii.

11.    **The Subclass,** numbers and comparable entitlements.  Census 2000 counted 239,655 residents of Hawaii who reported some degree of Hawaiian ancestry (In Census terminology, Native Hawaiian alone or in combination).  Subtracting those from the total Hawaii population of 1,211,537, the Subclass (residents with no Hawaiian ancestry) would have about 972,000 members.

12.    Since "Hawaiians" (one drop) make up about 20% of the State of Hawaii population, for every dollar going exclusively for "Hawaiians", four dollars should have been, and in the future should be, distributed or allocated exclusively to or for plaintiffs and the other members of the Subclass (Hawaii residents with no Hawaiian ancestry).

13.    **The Municipal Subclasses.**  To comply with the Constitution's promise of Equal Protection of the laws and equal privileges and immunities under the law, the County Defendants, if they continue to exempt Hawaiian Homesteaders from some real property taxes, must extend that exemption to all real property taxpayers in their respective counties.  If they make other disbursements or allocations exclusively for native Hawaiians or Hawaiians or deprive Plaintiffs or any members of the Municipal Class of their respective county of the equal protection of the laws or equal privileges and immunities under the laws, they must extend equivalent benefits to all Plaintiffs and members of the Municipal Class for their respective counties.

14.    Plaintiffs seek to maintain the **Class** (Hawaii residents with less than 50% or no Hawaiian ancestry), pursuant to Rules 23(b) and 23(c)(4) on the issues challenging exclusive benefits for "native Hawaiians"; Plaintiffs, except for the three with part but

less than 50% Hawaiian ancestry, seek to maintain the **Subclass** (Hawaii residents with no Hawaiian ancestry) on the issues challenging exclusive benefits for "Hawaiians." Plaintiffs who pay real property taxes in each county seek to maintain the **Municipal Subclass** for their county to challenge the real property tax exemption given to Hawaiian Homesteaders, and other racially discriminatory laws, customs or usages of their respective counties.

15.     The Class and Subclass and Municipal Subclasses are so numerous that joinder of all members of any of them is impracticable.

16.     Common questions of law and fact exist as to all members of the Class and each of the subclasses and predominate over any questions solely affecting individual members of the Class and subclasses.  Among the questions of law and fact common to the Class and each of the subclasses is whether defendants violated the Fifth and Fourteenth Amendments to the United States Constitution, and federal laws, 42 U.S.C. §§1985(3), 1986 and 2000d et seq. and federal trust law, by discriminating and by conspiring to discriminate against members of the applicable class or subclass on the basis of race or failed to protect the applicable class or subclasss members from conspiracy, and whether they will continue to do so.

17.     Plaintiffs' claims are typical of the claims of the members of the Class and they are adequate representatives of the Class.

18.     Plaintiffs' claims (except for the claims of the three Plaintiffs of Hawaiian ancestry) are typical of the claims of the Subclass and they are adequate representatives of the Subclass.

5

19.    The claims of Plaintiffs who own interests in real property  and are required to pay real property taxes but are not Hawaiian Homesteaders or eligible to be, are typical of the claims of the members of the Municipal subclass for that county and they are adequate representatives, respectively, of the Municipal Class for each county.

20.    Plaintiffs and members of the Class and Subclass and each of the Municipal Subclasses have sustained damages, and will sustain damages in the future if defendants are not enjoined, because of the unlawful activities alleged herein.  Plaintiffs have retained counsel competent and experienced in race discrimination litigation involving Hawaiian entitlements and intend to prosecute this action vigorously.  Plaintiffs will fairly and adequately protect the interests of the Class and Subclass.and each of the Municipal Subclasses.

***Kapu* to We the People to ... *Kapu* Again?**

21.    The Appendix to this amended complaint is a timeline of historic events showing Hawaii's progression from monarchy and subjugation under the *Kapu* system in 1778 (when the Alii held the rule and possessed the land title and commoners were subject and landless) toward freedom, democracy and equality; the reversal of that course in 1921 by enactment of the Hawaiian Homes Commission Act, officially requiring racial discrimination in the Territory of Hawaii; and the subsequent progression back toward subjugation where a new Alii now holds the rule and threaten, by the Akaka bill, to make Plaintiffs and all other American citizens in Hawaii similarly situated, subject and landless.

**Count I. Claims by the Municipal Subclasses for
Equal Exemptions from Real Property Taxes under
the Equal Protection clauses of the Fifth and Fourteenth Amendments
and 42 U.S.C. §§1985(3), 1986 and 2000d et seq.**

22.    Plaintiffs reallege paragraphs 1 through 21 as if set forth fully.

23.    HHCA §208(8), enacted by the United States Congress in 1921, provides in part that "an original [ Hawaiian homestead ] lessee shall be exempt from all taxes for the first seven years after commencement of the term of the lease."

24.    Under the State of Hawaii Constitution, Art. VIII, Sec. 3, adopted in 1978, "all functions, powers and duties relating to the taxation of real property shall be exercised exclusively by the counties, with the exception of Kalawao."

25.    The City and County of Honolulu and the counties of Hawaii, Maui and Kauai all recognize and implement the seven year real property tax exemption required by HHCA §208(8); and extend it to later years.  They exempt Hawaiian home lands leased as homesteads (house lots, farm lots and pastoral lots) from real property taxes except for minimum taxes of, on information and belief, $25 in the case of Kauai and $100 in one or more of the other counties.  By limiting the exemption to Hawaiian Homestead lessees, all four of the counties deprive Plaintiffs and others similarly situated of equal privileges and immunities.  (Plaintiffs and all members of the Municipal subclasses, solely because they lack the "not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778," can never become Hawaiian Homesteaders and their ownership of an interest in real estate in Hawaii, therefore, can never qualify for the exemption)

26.    Because Hawaiian Homesteaders pay reduced or no real property taxes in every county, but still use county roads, sewers, water lines, refuse disposal, fire, police,

safety and other county infrastructure and services, Plaintiffs and all members of the Municipal subclasses for their respective counties, have to pay more to carry them.

27.    The most recent DHHL Annual Report shows 8,418 homestead leases in effect statewide as of June 30, 2006. Assuming a value for the homestead lots even well below median home values statewide, each of those homesteaders is probably saving about $1,000 annually; and the four counties altogether are under-collecting real property taxes in the aggregate of about $8.4 million annually. Each Plaintiff and every member of the four Municipal subclasses is therefore deprived of an equivalent annual saving of about $1,000, because his or her interest in real estate is denied the exemption given exclusively to Hawaiian Homesteaders, a status Plaintiffs and others similarly situated can never achieve solely because they lack the favored racial ancestry.

28. The counties' discriminatory real property tax exemptions for Hawaiian Homestead lessees, are just one part of a common and unlawful plan of the federal, state and local governments or their officials, i.e., a conspiracy within the meaning of 42 U.S.C. §1985(3) to deprive persons of rights or privileges.

29.    The United States, in 1921, enacted the HHCA and originated the explicitly racial discrimination in favor of "native Hawaiians" defined as "any descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778."

30.    Even after the Civil Rights Act of 1964 Title VI, 42 U.S.C. §2000d et. Seq. which provides "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial

assistance", the United States has continued to support DHHL and multiple other

Hawaiian-only or native Hawaiian-only entitlements. For example, in 1990, the United

States amended the "HUD", Housing and Community Development Act of 1974 to waive

the race discrimination prohibitions regarding assistance to Hawaiian Home lands.

Pub.L. 101-625, Sec. 911, added subsec. (d), thereby rather blatantly purporting to give

HUD a free pass to discriminate by race in favor of native Hawaiians and against other

United States citizens residing in Hawaii.

31.     After 1978, the counties' continuation of the discriminatory real property

tax exemptions for Hawaiian Homestead lessees far beyond the first seven years of each

homestead lease, indicates they have each enthusiastically joined in the unlawful plan.

32.     The conspiracy between the federal, state and county governments

continues at an accelerated pace. Since 2002 DHHL has received $37,013,550 of block

grants from HUD. (DHHL Ann. Rept. FYE June 30, 2006 at 8 available online at the

DHHL homepage.) That annual report praises the actions of the counties, state and

federal governments; shows photos of some of the co-conspirators, including Governor

Lingle on page 8, HUD Asst. Sec Orlando Cabrera with his hand on HHC Chairman

Micah Kane's shoulder on page 9, and, on page 13, a chart showing a five-fold increase

in annual homestead lease awards in 2006 over 2004 and earlier years. As of June 30,

2006, under the Hawaiian Home Lands Recovery Act of 1995, 913 acres of Federal

excess properties had been conveyed to DHHL. (*Id.* at 31).

33.     On February 15, 2007 U.S. Senator Dan Inouye announced in his press

release (available online at his Senate home page) that members of the Hawaii

Congressional Delegation are pleased to have worked for the inclusion of nearly $62.5

million in Native Hawaiian initiatives into the final appropriations measure for the current fiscal year. Included among those items is "nearly" $9 million for Native Hawaiian Housing Block Grants for which DHHL is the sole recipient. On about April 4, 2007 Hawaii's Congressional delegation filed with the U.S. Supreme Court in Doe v. Kamehameha Schools, et al No. 06-1202, an amicus brief urging the high court not to review KSBE's racially discriminatory admission policy which, through the charitable exemption is subsidized by millions, perhaps hundreds of millions of federal and state dollars annually. To Plaintiffs' knowledge, Hawaii's Congressional delegation has never worked for any appropriations or exemptions exclusively for Plaintiffs or the members of the classes and subclasses Plaintiffs represent.

34.     By the acts described above and by other laws, actions, customs and usages, the United States and the State of Hawaii or their respective officials, agents or agencies have conspired with and actively participated in and carried out with the City and County of Honolulu and the Counties of Hawaii, Maui and Kauai, the deprivation of the equal protection of the laws and the equal privileges and immunities of Plaintiffs and others similarly situated in violation of the Equal Protection clauses of the Fifth and Fourteenth Amendments and 42 U.S.C. §§1985(3), 1996 and 2000d et seq.

35.     Moreover, with knowledge of the wrongs conspired to be done and about to be committed, and having the power to prevent, or aid in preventing the commission of the same, the United States and the State of Hawaii and its officials and the City and County of Honolulu and the counties of Hawaii, Maui and Kauai or their officials, failed or refused to do so and, accordingly, are liable under 42 U.S.C. 1986 for damages or

declaratory and injunctive relief to prevent further injuries caused to Plaintiffs and all other members of each of the Municipal classes.

36. As a result of the aforesaid conspiracy and laws, acts, omissions and failures of the Federal Defendants, State Defendants, HHC/DHHL Defendants and County Defendants of each of the four counties, Plaintiffs and all members of each of the Municipal Classes have been deprived of the equal protection of the laws and equal privileges and immunities under the law and are likely to continue to suffer further such deprivations in the future unless such unlawful activities by Defendants are permanently enjoined.

### Count II. Claims of the Class and Subclass for distributions and allocations (equivalent to those going exclusively for native Hawaiians and Hawaiians) under the Equal Protection clauses of the Fifth and Fourteenth Amendments and 42 U.S.C. §§1985(3), 1986 and 2000d et seq.

37. Plaintiffs reallege paragraphs 1 through 36 as if set forth fully.

### Claims of Class for distributions equivalent to those for native Hawaiians

38. The State of Hawaii has distributed approximately $1 billion exclusively for the small group of about 30,000 "native Hawaiians" since 1990, taking into account cash, land in lieu of cash, and items such as liabilities incurred and debt service on moneys borrowed to pay OHA and DHHL for native Hawaiians, and the rent-free use of public land. (See spreadsheets itemizing losses to State treasury, Further Excerpts of Record 3A in the appeal of this case to the Ninth Circuit.) The State currently disburses about $45 million annually exclusively for "native Hawaiians." OHA now holds about $400 million earmarked exclusively for "native Hawaiians." The State, during that

11

period has made no disbursements to or for the exclusive benefit of Plaintiffs and the other members of the Class.

39.     Since 2002 the United States through its Department of Housing and Urban Development "HUD" had disbursed to DHHL $37,013,550 of block grants as of June 30, 2006. (DHHL Ann. Rept. FYE June 30, 2006 at 8 available online at the DHHL homepage.) In addition, as of June 30, 2006, under the Hawaiian Home Lands Recovery Act of 1995, 913 acres of Federal excess properties had been conveyed to DHHL. In addition, by a continuing Resolution by Congress in February 2007, an additional nearly $9 million for Native Hawaiian Housing Block Grants (for which DHHL is the sole recipient) was added to the funding for the current fiscal year ending September 30, 2007. Only native Hawaiians are eligible to receive awards of Hawaiian homestead leases. The United States, during that period has made no disbursements to or for the exclusive benefit of Plaintiffs and the other members of the Class.

40.     Since "native Hawaiians" (50% or more Hawaiian ancestry) make up considerably less than 5% of the State of Hawaii population, for every dollar going exclusively for "native Hawaiians", at least nineteen dollars should have been distributed exclusively to or for Plaintiffs and all the other members of the Class: At the current rate of $45 million per year, the State should be disbursing $855 million annually exclusively to or for the Class. Since OHA now holds about $400 million of public funds exclusively for "native Hawaiians", the State should, to comply with the Constitution's promise of Equal Protection of the laws to every person, disburse or allocate $7.6 billion exclusively to or for the benefit of Plaintiffs and all the other members of the Class.

41.    For the same reason, the United States, to comply with the Constitution's promise of Equal Protection of the laws to every person, should have disbursed or allocated, between 2002 and June 30, 2006, about $703 million of block grants exclusively to or for the benefit of Plaintiffs and all the other members of the Class. For the current fiscal year if it continues to disburse public moneys to persons selected on the basis of their race, it should disburse or allocate $171 million exclusively to or for the benefit of Plaintiffs and the other members of the Class.

### Claims of Subclass for distributions equivalent to those for Hawaiians

42.    Between July 1, 1990 and June 30, 2002 the State of Hawaii disbursed cash of over $78 million to OHA, in addition to the far greater amounts the State disbursed to OHA earmarked for native Hawaiians. The OHA Annual Report for the year ending June 30, 2005, financial statement showed revenue from State of Hawaii appropriations of $2,498,460.

43.    Since "Hawaiians" (persons with at least one drop of Hawaiian ancestry) make up about 20% of the State of Hawaii population, for every dollar going exclusively for "Hawaiians", at least four dollars should have been distributed exclusively to or for plaintiffs and all the other members of the Subclass: At the current rate of about $2.5 million per year distributed for Hawaiians on the basis of their race, the State should be disbursing $10 million annually exclusively to or for members of the Subclass.

44.    On November 27, 2006 investigative Reporter Jim Dooley of the Honolulu Advertiser reported that OHA spent $2 million on its congressional lobbying efforts for the Akaka bill --- a third of all money spent by Hawaii companies, private citizens and government agencies on Washington lobbying since 2003. The report quotes

the OHA administrator as saying that $2 million does not include $900,000 spent by

OHA since 2003 to operate and staff a "Washington bureau", nor does it include costs

incurred by regular visits to Washington DC by OHA and other state officials, including

Governor Linda Lingle, to seek passage of the Akaka bill. And it does not include

$120,000 spent by Maui-based private developer Everett Dowling's company on pro-

Akaka bill Washington lobbying. Dowling has been involved in several development

deals with the Department of Hawaiian Home Lands on Maui.

45.     Subsequently the Chairperson of OHA said in a public Q&A blog

sponsored by the Honolulu Advertiser, OHA planned to continue lobbying for the Akaka

bill and would spend another $2 million if necessary.

46.     The Akaka bill (S. 310/H.R. 505 in the current Congress) would give

Hawaiians political power superior to that of other citizens and it would sanction the

breakup and giveaway of some unknown amount, perhaps all, of the State of Hawaii's

lands, natural resources, appurtenant reefs, territorial waters, governmental power and

authority and civil and criminal jurisdiction. Spending public moneys to lobby for its

passage, therefore, not only deprives of Plaintiffs and all members of the Subclass of

comparable amounts of the moneys spent, but threatens to deprive them of their political

power and sovereignty over the entire State of Hawaii guaranteed in the Admission Act

and the Hawaii Constitution.

47.     On March 20, 2000 U.S. Senator Daniel Inouye's office summarized then

recent awards by Congress to Hawaiians (probably including some just for "native

Hawaiians" and others for all "Hawaiians") through grants and other programs of over

14

$440 million. On February 15, 2007 Senator Inouye's office announced the inclusion of $62.5 million for Native Hawaiian initiatives in the current fiscal year.

48.    These federal disbursements for housing, medical, education and other benefits now given exclusively for "native Hawaiians" or "Hawaiians" in Hawaii should be extended to cover all citizens of Hawaii; or, to eliminate the racial discrimination, additional disbursements of 19 or 4 times, respectively, of those amounts must go exclusively to or for members of the Class or Subclass. At the current rate of $62 million annual federal disbursements, if the Constitution's promise of Equal Protection of the laws to every person is to be honored, between $248 million and $1.18 billion more should be disbursed annually by the United States exclusively to or for the Class and Subclass.

49.    By the acts described above and by other laws, actions, customs and usages, the United States and the State of Hawaii or their respective officials, agents or agencies have conspired and actively participated in and carried out the deprivation of the equal protection of the laws and the equal privileges and immunities of Plaintiffs and others similarly situated in violation of the Equal Protection clauses of the Fifth and Fourteenth Amendments and 42 U.S.C. §§1985(3), 1996 and 2000d et seq.

50.    Moreover, with knowledge of the wrongs conspired to be done and about to be committed, and having the power to prevent, or aid in preventing the commission of the same, the United States and the State of Hawaii and its officials, failed or refused to do so and, accordingly, are liable under 42 U.S.C. 1986 for damages or declaratory and injunctive relief to prevent further injuries caused to Plaintiffs and all other members of each of the Municipal classes.

51.    Plaintiffs and all members of the Class and the Subclass are likely to

continue to suffer further such deprivations in the future unless such unlawful activities

by Defendants are permanently enjoined.

### Count III. Claim of the Class (less than 50% or no Hawaiian ancestry) for breach of the Ceded Lands Trust

52.    Plaintiffs reallege paragraphs 1 through 51 as if set forth fully.

53.    The scope of the U.S. fiduciary duty in administering trust property

is a question of federal law.  U.S. v. Mason, 412 U.S. 391, 397 (1973).

54.    The common law of trusts applicable to federally created trusts

may be found in the Restatements of the Law of Trusts.  For example, see *Price v.*

*Akaka*, 828 F.2d 824, 827 (9th Cir. 1991).

55.    Under the Restatement of the Law of Trusts 2d,

§214, Several Beneficiaries,

(1)  If there are several beneficiaries of a trust, any beneficiary can
maintain a suit against the trustee to enforce the duties of the trustee to
him or to enjoin or obtain redress for a breach of the trustee's duties to
him.

§201 What Constitutes a Breach of Trust,

A breach of trust is a violation by the trustee of any duty which as trustee
he owes to the beneficiary.

Under § 166. Illegality,

(1) The trustee is not under a duty to the beneficiary to comply with a term of the
trust which is illegal.

(2) The trustee is under a duty to the beneficiary not to comply with a term of the
trust which he knows or should know is illegal, if such compliance would be a serious
criminal offense or would be injurious to the interest of the beneficiary or would subject
the interest of the beneficiary to an unreasonable risk of loss.  (emphasis added.)

16

56.    The aforesaid conspiracy, the OHA laws, the HHCA/DHHL laws and the ongoing acts of the State Defendants, HHC/DHHL Defendants, OHA Defendants and County Defendants and the Federal Defendants in implementing and enforcing or assisting, aiding or abetting their enforcement and the ongoing administration and continuance in effect of the Homestead leases, breach the fiduciary duty those Defendants, owe to Plaintiffs and all members of the Class as beneficiaries of the Ceded Lands Trust and are ongoing violations of federal laws.

**Prayer**

Wherefore, plaintiffs pray that this Court:

A. **Grant Class certification**;

B. **Declare** pursuant to 28 U.S.C. §§2201 and 2202**:**

1.    **As to real property tax exemptions,** in the absence of comparable exemptions for every real property taxpayer, the special exemptions from real property taxes given to Hawaiian Homesteaders by each of the four counties of the State of Hawaii violate the Fourteenth Amendment and 42 U.S.C. §§1985(3), 1986 and 2000d et. seq. and are invalid;

2.    **As to disbursements, allocations for native Hawaiians (50% or more),** in the absence of comparable disbursements and allocations for every Hawaii resident, the disbursements or allocations of public money, land,  revenues from public lands, or other benefits, privileges or immunities exclusively for native Hawaiians pursuant to the OHA laws, HHCA laws, including §4 of the Admission Act of March 18, 1959, the Native Hawaiian Housing Block Grant Program and related laws, violate the Fifth and Fourteenth Amendments and 42 U.S.C. §§1985(3), 1986 and 2000d et. seq. and federal

17

trust law and are invalid;

3.    **As to disbursements, allocations for Hawaiians (one drop),** in the absence of comparable disbursements and allocations for every Hawaii resident, the disbursements or allocations of public money, land, privileges or immunities exclusively for Hawaiians pursuant to the OHA laws, HHCA laws, the federal Native Hawaiian education programs under the No Child Left Behind Act, the native Hawaiian Health Care Improvement Act, and the Native Hawaiian Institutional Aid provision of the Higher Education Act, and related laws violate the Fifth and Fourteenth Amendments and 42 U.S.C. §§1985(3), 1986 and 2000d et. seq. and are invalid;

4.    **As to funds, property, investments now held.** All moneys, investments, lands and property of any kind, and all earnings thereon and growth thereof, held by or for OHA, HHC or DHHL, are general funds and property of the State of Hawaii;

a.    All such property is free of any trust or other encumbrance which restricts its use to the benefit of Hawaiians or native Hawaiians or prevents it from being used for the benefit of all of the people of Hawaii; and

b.    All such property is within the care and control of the Defendant Governor to be used for such constitutional and non-discriminatory purposes as the State deems appropriate and in compliance with the public land trust for the inhabitants of the State of Hawaii; and

5.    **As to existing Homestead leases,** continued management, administration and enforcement of the existing Homestead leases by HHC/DHHL defendants would be an ongoing and continuing violation of federal law (the equal protection clause of the Fourteenth Amendment and the Civil Rights Act) and a continuing breach of the State's

18

fiduciary duty, under federal law, as trustee of the public land trust;

C. **Negotiation with existing homesteaders.** Order the HHC/DHHL defendants and/or the State Defendants to negotiate with the existing Homesteaders for the State's exercise of its right to withdraw the lands demised in a way that is fair to the Homesteaders but does not further violate the rights of plaintiffs and others similarly situated. [1]

D. **Enjoin County Defendants.** Permanently enjoin each of the County Defendants from collecting any further real property taxes until each of them has either given comparable exemptions for every real property taxpayer, or has repealed the special exemption for Hawaiian homesteaders and has assessed and is collecting taxes from Hawaiian homesteaders without any special exemption.

---

[1] Such negotiations could result in a global settlement under which, for example, the fee simple interest in the demised land is conveyed to the Homesteader in exchange for no or a reduced payment and a complete release of all claims by the Homesteader and his heirs and assigns against all parties, including all claims against the State of Hawaii and the United States and anyone else arising out of or related to the Homestead leases, the HHCA laws, the OHA laws the Apology resolution, the overthrow of the monarchy, annexation, independence, reparations and any other claims for Hawaiian entitlements. If the fair market value of the land demised were, say, $50,000, the fee might be conveyed with no payment required. If the fair market value was $200,000 the Homesteader might be required to pay $150,000 within ten years or earlier if the Homesteader sells or mortgages the land or ceases to occupy it as the Homesteader's residence. These are just examples showing how plaintiffs believe a fair settlement might be reached. Plaintiffs do not ask the court to order such a settlement. Plaintiffs do believe that any settlement reached should be subject to this court's approval, to ensure that the interests of plaintiffs and others similarly situated are protected. If no settlement is reached by the State and Homesteaders within a reasonable time, plaintiffs believe the court should order the State defendants and the HHC/DHHL defendants to withdraw the lands demised by the Homestead leases. In that event, and if the Homesteaders intervene in this action, plaintiffs believe the court should adjudicate the manner in which the demised lands are withdrawn so that it is fair to the Homesteaders and does not further violate the rights of plaintiffs and others similarly situated.

E. **Enjoin further implementation of HHCA.** Permanently enjoin the HHC/DHHL defendants from issuing any further Homestead leases, making any further grants, loans, guarantees, transfers, contracts or expenditures or planning, constructing or implementing any further developments relating to DHHL projects, or from otherwise further implementing, enforcing or carrying out the HHCA laws; permanently enjoin the United States and the State of Hawaii and their respective officials from enforcing or complying with the Compact in §4 of the Admission Act; and permanently enjoin all defendants from funding, assisting, aiding or abetting the implementation of the HHCA laws.

F. **Enjoin further implementation of OHA laws.** Permanently enjoin the OHA defendants from making any further expenditures for lobbying, advertising, litigation, grants, loans, or making any further guarantees, transfers, contracts or expenditures relating to the OHA laws or from otherwise further implementing, enforcing or carrying out the OHA laws; and permanently enjoin all other defendants from funding, assisting, aiding or abetting the implementation of the OHA laws.

G. **Enjoin all other laws, acts.** Permanently enjoin all defendants from, under color of any other federal, state or local law or by any actions, customs or usages, giving native Hawaiians or Hawaiians any right, title or interest in the ceded or public lands of the State of Hawaii, or the proceeds or income there from, or any right, privilege or immunity not given equally to all citizens of Hawaii.

H. **Transfer of OHA property to State.** Order the OHA defendants to transfer to the State defendants all moneys, investments, lands and property of any kind, and all earnings thereon and growth thereof, held by or for OHA;

I. **Transfer of HHC/DHHL property to State.** Order the HHCA/DHHL

20

defendants to transfer to the State defendants all moneys, investments, lands and property of any kind, and all earnings thereon and growth thereof, held by or for HHC and DHHL;

J.   **Retain jurisdiction.**  Retain jurisdiction to exercise its equitable powers and issue such further orders in aid of execution of its judgment, to resolve disputes as to settlements between the State defendants and the individual Homesteaders and to accomplish, to the greatest extent possible, either a global settlement or final adjudication of all related claims.

K.  **Costs, attorneys fees, other relief.**  Allow plaintiffs their costs herein, including reasonable attorneys' fees, and such other and further relief as is just.

Dated: Honolulu, Hawaii this _____ day of May, 2007.


_____
H. WILLIAM BURGESS
Attorneys for Plaintiffs

**APPENDIX TO AMENDED COMPLAINT 4/30/07**

Arakaki v. Lingle, Civil No. 02-00139 SOM/KSC

### *Kapu* to We the People to … *Kapu* Again?

This timeline of historic events shows Hawaii's progression from monarchy and subjugation under the *Kapu* system in 1778 (when the Alii held the rule and possessed the land title and commoners were subject and landless) toward freedom, democracy and equality; the reversal of that course in 1921 by enactment of the Hawaiian Homes Commission Act, officially requiring racial discrimination in the Territory of Hawaii; and the subsequent progression back toward subjugation under which a new Alii now holds the rule and threaten, by the Akaka bill, to make Plaintiffs, and all other American citizens in Hawaii similarly situated, subject and landless.

After Captain Cook's "discovery" in 1778, Hawaii transformed itself within about 140 years from being the most hierarchical of the Polynesian chiefdoms, where high rank held the rule and possessed the land title and commoners were subject and landless and without a written language; toward the highest ideal of American democracy: free enterprise with broadly shared prosperity where all men and women are created equal, well educated, good and industrious.

### Hawaiians themselves broke the *Kapu*, rejected their ancient religion and culture.

Kamehameha the Great, who, with the help of his non-native friends, had unified the Hawaiian Islands in 1810, died in 1819.  Shortly after that, his son, Liholiho (Kamehameha II), and widow Kaahumanu, who became the de facto *moi*, or King, broke the *Kapu*, ordered destruction of the *heiaus* throughout the Islands, burned the wooden

idols and rejected the ancient religion and culture.  Into this religious and cultural
vacuum, the first American missionaries
arrived the next year, 1820.  Soon Kaahumanu took charge of Christianity, made it the
new *Kapu*, displacing *Lono* and *Ku* as the path to *mana*.  Hitch, *Islands in Transition,*
First Hawaiian Bank (formerly Bishop Bank), 1992, distributed by University of Hawaii
Press, at 21, 22; Kame'eleihiwa, *Native Land and Foreign Desires*, Bishop Museum
Press, 1992, at 74-79 and 154.

By the mid 1850's the *ali'i nui* themselves had abolished the *kapu* system;
adopted a Bill of Rights laying the legal basis for a free-enterprise economy, under which
the people of Hawaii were set free to work and otherwise manage their affairs as they
wanted and to accumulate personal property and pass it along to their heirs; provided
Hawaiians with a written form of their previously oral language and established
widespread public schools and an exemplary level of literacy among all classes; adopted
an American-style written constitution giving commoners an institutional voice in the
government and guaranteed a regime of law for business transactions and property
holding;  Kamehameha III and 245 chiefs had agreed among themselves how much land
should go to the crown and how much to the chiefs and in 1850 the legislature had
ordered grant of fee-simple titles to native tenants for their *kuleanas*, the parcels of land
cultivated by them.  By the end of the *mahele*, or land division, in 1855, less than 30,000
acres were awarded to the native tenants.  However, these tracts of land consisted chiefly
of taro lands and were considered the more valuable lands in the Islands.2  The *kuleana*
grants put land into the hands of about two out of every three Hawaiian families, said to

_____

2  Chinen, *The Great Mahele, Hawaii's Land Division of 1848*, University of Hawaii Press, 1848 at 31.

be "a record of fee simple ownership among natives unique in the early 19th century."[3]

Kamehameha's great-grand daughter who would be the last survivor of his direct descendants, Bernice Pauahi Bishop, was born in 1931 and lived for 52 years during that period. Her greatest achievement fit those ideals perfectly. In her will, which went into effect upon her demise in 1884, she left 378,569 acres of choice land in Hawaii in trust "to provide first and chiefly a good education in the common English branches, and also instructions in morals and in such useful knowledge as may tend to make good and industrious men and women." The will contains no racial restriction for admission to the schools. It leaves admission decisions to the trustees and directs the trustees, after purchasing suitable premises, erecting and furnishing school buildings and paying for the maintenance and operation of the schools, to "devote a portion of each year's income to the support and education of orphans, and others in indigent circumstances, giving preference to Hawaiians of pure or part aboriginal blood." Her own English was impeccable and she had a deep understanding and rapport with America and Americans. She and a whole coalition of Hawaiians and *haole* strongly opposed King Kalakaua's actions in September 1880 when he dismissed his cabinet and appointed the adventurer Celso Caesar Moreno as Premier and Minister of Foreign Affairs. Mrs. Bishop and her husband, Charles Reed Bishop, gradually became estranged from Kalakaua. Kanahele, *Pauahi, The Kamehameha Lagacy,* Kamehameha Schools Press, 1986, at 158. Her husband and the other four trustees she personally appointed to manage the trust all favored annexation of Hawaii to the United States.

Mr. Bishop, in his own right, was a major benefactor of the Kamehameha Schools-Bishop Estate ("KSBE"). Immediately after his wife's death, he set in motion

---

3  Hitch, *Islands in Transition, supra.* at 30.

the establishment of the schools.  Because his wife's estate was land rich and cash poor,

Mr. Bishop contributed his own funds for the construction of several of the schools'

initial buildings:  the Preparatory Department facilities (1888), Bishop Hall (1891) and

Bernice Pauahi Bishop Museum in 1899.  (From KSBE website 4/18/07.)  His cash

contributions exceeded the then-value of Mrs. Bishop's entire land holdings.

### 1898 - The public land trust established for inhabitants of the Hawaiian Islands

In 1898, the Republic of Hawaii ceded its public lands (about 1.8 million acres

formerly called the Crown lands and Government lands) to the United States with the

requirement that all revenue from or proceeds of these lands except for those used for

civil, military or naval purposes of the U.S. or assigned for the use of local government

"shall be used solely for the benefit of the inhabitants of the Hawaiian Islands for

educational and other public purposes".  *Joint Resolution to Provide for Annexing the

Hawaiian Islands to the United States,* Resolution No. 55, known as the *Newlands

Resolution,* approved July 7, 1898; Annexation Act, 30 Stat. 750 (1898) (reprinted in 1

Rev. L. Haw. 1955 at 13-15).

The *Newlands Resolution* established the public land trust.  Such a special trust

was recognized by the Attorney General of the United States in Op. Atty. Gen. 574

(1899); *State v. Zimring* 58 Haw. 106, 124, 566 P.2d 725 (1977) and *Yamasaki* 69 Haw.

154. 159, 737 P.2d 446, 449 (1987); see also Hawaii Attorney General Opinion July 7,

1995 (A.G. Op. 95-03) to Governor Benjamin J. Cayetano from Margery S. Bronster,

Attorney General, "Section 5 [Admission Act] essentially continues the trust which was

first established by the Newlands Resolution in 1898, and continued by the Organic Act

App. 4

in 1900. Under the Newlands Resolution, Congress served as trustee; under the Organic

Act, the Territory of Hawaii served as Trustee."

In 1898, about 31% of the inhabitants of Hawaii were of Hawaiian ancestry and

the remaining 69% were of other ancestry. Robert C. Schmitt, *Demographic Statistics of*

*Hawaii, 1778-1965* (Honolulu, 1968).

In 1900, the Organic Act, 31 Stat. 141 (1900), §73(e) reiterated that "All funds

arising from the sale or lease or other disposal of public land shall be … applied to such

uses and purposes for the benefit of the **inhabitants** of the Territory of Hawaii as are

consistent with the Joint Resolution of Annexation approved July 7, 1898." (Emphasis

added.)

Note: The public land trust, from its inception in 1898, required the ceded lands

and proceeds and revenues derived from them, except for the portions used by the U.S.

for civil and military purposes, to be held "solely for the benefit of the **inhabitants** of the

Hawaiian Islands", not just for those of Hawaiian ancestry. (Emphasis added.) Nor did

persons of Hawaiian ancestry, merely by virtue of their ancestry, have any special

entitlement to the use, income or proceeds of the public lands of the Kingdom of Hawaii.

The King conducted his government for the common good and not for the private interest

of any one man, family or class of men among his subjects. Constitution of 1852, Article

14. Every adult male subject, whether native or naturalized, was entitled to vote. *Id,*

Section 78. Everyone born in the Kingdom (except children of foreign diplomats) was a

native-born subject of the Kingdom. In the last half of the 19th century, the government

of the Kingdom actively encouraged immigration and offered immigrants easy

naturalization and full political rights. For example, the Civil Code of 1858 provided that

"[e]very foreigner so naturalized shall be deemed to all intents and purposes a native of the Hawaiian Islands ... and ... shall be entitled to all the rights, privileges and immunities of an Hawaiian subject."

### Annexation:  Increased power for Hawaiians

The political and economic power of Hawaiians increased dramatically once Hawaii became a Territory.  University of Hawaii Political Science Professor Robert Stauffer wrote:

It was a marvelous time to be Hawaiian.  They flexed their muscle in the first territorial elections in 1900, electing their own third-party candidates over the *haole* Democrats and Republicans...The governor-controlled bureaucracy also opened up to Hawaiians once they began to vote Republican.

By the '20s and '30s, Hawaiians had gained a position of political power, office and influence never before--nor since--held by a native people in the United States.

Hawaiians were local judges, attorneys, board and commission members, and nearly all of the civil service.  With 70 percent of the electorate--but denied the vote under federal law--the Japanese found themselves utterly shut out.  Even by the late 1930s, they comprised only just over 1 percent of the civil service.

This was "democracy" in a classic sense:  the spoils going to the electoral victors.

***

Higher-paying professions were often barred to the disenfranchised Asian Americans.  *Haoles* or Hawaiians got these.  The lower ethnic classes (Chinese, Japanese and later the Filipinos) dominated the lower-paying professions.

But even here an ethnic-wage system prevailed.  Doing the same work, a Hawaiian got paid more per hour than a Portuguese, a Chinese, a Japanese or a Filipino--and each of them, in turn, got paid more than the ethnic group below them.

Robert Stauffer, "Real Politics", Honolulu Weekly, October 19, 1994 at page 4.

App. 6

The alliance between Hawaiians, with a clear majority of voters through the 1922 election, and more than any other group until 1938, and the Republican party is described in more depth in Fuchs, *Hawaii Pono: A Social History*, Harcourt, Brace & World, Inc., 1961, at 158-161.

The United States Congress itself reversed Hawaii's aspiration for equality in 1921 by, for the first time, officially interjecting race into the previously race-neutral Ceded Lands Trust; adopting the HHCA and setting aside some 200,000 acres of the ceded lands for the exclusive use of native Hawaiians, defined not by need or merit or industriousness but explicitly and solely by race: "any descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778."

### 1954 – The Democratic Revolution
### and its temporary impact on Hawaiians

In his 1994 article, Professor Stauffer wrote,

The "decline" in the standard of living of Native Hawaiians can only be tracked to the early 1950s, when the Democratic Party began its political dominance of government as a result of the "Democratic Revolution of 1954". Hawaiians, being overwhelmingly Republican, found themselves displaced from such well-paying jobs as the civil service and Department of Education which they had previously controlled. *Id.*

### 1959 – Statehood, conspiracy, land values
### and the civil rights movement.

In 1959, as a condition of statehood, the United States required in §4 of the Admission Act that the new State of Hawaii, by compact between the two governments, adopt the HHCA as part of the State's Constitution and use all proceeds and revenues of the approximately 200,000 acres of Hawaii's ceded lands

App. 7

set aside as "available lands" for the HHCA, "only in carrying out the provisions of said Act."

This compact is a "smoking gun" proving a common and unlawful plan between the United States and the State of Hawaii, i.e., a conspiracy to interfere with the civil rights of American citizens in Hawaii. The compact not only requires the State of Hawaii to carry on the HHCA but it reserves to the United States that the State will not repeal the Act or change the explicitly racial qualification for the lessees or reduce benefits to native Hawaiians without its consent. The compact remains in full force today.

With Hawaii becoming the 50th State, mass tourism began and land values climbed. Kamehameha Schools-Bishop Estate ("KSBE") charitable trust was at the center of one of the hottest real estate markets in the world, owning about one in every 6.3 acres in the state not owned by the federal or state governments. (Acreage numbers based on the most recent Atlas of Hawaii, 2d Ed. 1983.)

The civil rights movement of the 1960's (which triggered the "Hawaiian Rennaissance") also had a negative spin as peoples everywhere became increasingly sensitive to racial differences not only as sources of inequity and injustice but as opportunities for individual self-aggrandizement. Claims to compensation for group injustices began to be advanced around the globe by ethnic leaders. Carrington, *Testamentary Incorrectness: A Review*, Vol. 54 Buffalo Law Review 693, 705-709, Dec. 2006.

The rise of Hawaiians to leadership of organized crime occurred at the same time as the Hawaiian political and cultural revival movements, the "Hawaiian renaissance"

that began in the late 1960s and early 1970s.  Cooper & Daws, *Land and Power in Hawaii*, Benchmark Books, Inc., 1985, at 252, see also Chapter 7, Organized Crime.

### 1967 - Land reform

In 1967 Hawaii's Land Reform Act, called "mandatory leasehold conversion" gave homeowners on leased land a way to buy the land under their single-family dwellings, even if owners of that land did not wish to sell.  KSBE challenged the constitutionality of the law and its implementation was stayed pending appeal to the U.S. Supreme Court.

### 1978 – John Waihee elected to ConCon.
### Hawaii Constitution purportedly amended, creates OHA,

In 1978, John Waihee won his first elective office: Delegate to the 1978 Hawaii Constitutional Convention.  Leading a tightly knit group of fellow graduates from the first class of the University of Hawaii Law School, he was the force behind the throne at the convention.  As a result of the ConCon recommendations, Hawaii's Constitution was purportedly amended to establish an Office of Hawaiian Affairs ("OHA").  Amended Article XII, Section 6 of the State of Hawaii Constitution provides that the board of trustees of OHA "shall exercise power as provided by law; to manage and administer the proceeds from the sale...and income...including all income and proceeds from that pro rata portion of the trust referred to in section 4 of this article for native Hawaiians." Section 4 does not specify any pro rata portion.

In 1980, the Hawaii Legislature enacted Section 10-13.5 H.R.S. "Twenty per cent of all funds derived from the public land trust, described in Section 10-3, shall be expended by the office [OHA], as defined in section 10-2, for the purposes of this chapter."

App. 9

**1984 - Land Reform Act upheld.  KSBE inundated with cash.**

The Supreme Court in 1984 upheld the Land Reform Act of 1967 enacted by the Hawaii legislature to reduce the perceived social and economic evils of a land oligopoly traceable to the early high chiefs of the Hawaiian Islands.   Within just a few years, KSBE's land sales brought in nearly $2 billion for the trust, tax free.

### John Waihee Governor 1986 – 1994.
### Money gushes from State Treasury.

In 1986 John Waihee won election as Governor of Hawaii, the first Native Hawaiian elected to that office.

In 1990 the Hawaii Legislature in Act 304 defined "revenue" from which OHA is to share, retroactive to 1980, as "all proceeds, fees, charges, rents or other income … derived from any … use or activity, that is situated upon and results from the actual use of lands comprising the public land trust".

Act 304, which was interpreted to calculate OHA's "pro rata share" on the gross revenues, (rather than on "income" as provided in the Hawaii Constitution or on net income after expenses as required under trust law).

Act 304 also mandated that OHA and the State Department of Budget and Finance ("B&F") negotiate the amounts payable to OHA for the years 1980 through 1991.

In 1993, after extensive discussions, a proposal for payment of about $130 million, including interest, for the years 1980 through 1991, supported by both OHA and the State administration, was submitted to the Legislature.  State officials, including the then Director of the Department of Budget and Finance, testified that such amount would "settle" or constitute "paying the full amount" of OHA's claims to revenues from the ceded

lands for 1980-1991. OHA did nothing to dispel this understanding but rather confirmed it. The Legislature, by Act 35, then authorized and appropriated the amount in general obligation bond funds to be paid to OHA for this purpose.

In April 1993, after Act 35 was enacted, OHA and an official from the Office of State Planning ("OSP") which was part of Governor Waihee's office as Governor, signed a Memorandum which stated in part "OSP and OHA recognize and agree that the amount specified in Section 1 hereof does not include several matters regarding revenues which OHA has asserted is due to OHA and which OSP has not accepted and agreed to."

In June 1993 the approximately $130 million was paid to OHA for its share of the ceded lands revenues for 1980 through 1991.

### 1994 - OHA sues for more for same period, 1980 – 1991. Waihee commits State to additional $600 million

In January 1994, OHA commenced a lawsuit, *OHA v. State of Hawaii*, seeking payment of additional amounts going back to 1980 arising from receipts of the Waikiki duty-free shop, public housing, the Hilo Hospital and investment earnings on unpaid "revenue."

In October 1996, Circuit Court Judge Daniel G. Heely granted OHA's motion for partial summary judgment, ruling that OHA is entitled to a 20% share of each of the items in question. The State appealed and the Hawaii Supreme Court until 1999 deferred ruling while the State and OHA discussed settlement.

Media accounts estimated that, if Judge Heely's decision was affirmed, between $300 million and $1.2 billion may be payable to OHA for the period 1980 through 1991 in addition to the $130 million already paid to settle OHA's claims for that period.

On December 2, 1994, just before Governor Waihee's term expired, his Office of State Planning signed a Memorandum of Understanding with the DHHL and DLNR to create a Hawaiian home lands settlement fund and pay it $30 million per year for 20 years: Total $600 million. Since then, on information and belief, the State of Hawaii has made the annual payments as provided in that memorandum of understanding.

### 1997 – Broken Trust published in Star-Bulletin

In 1997 prominent community members wrote an essay, "Broken Trust" that was published in the Honolulu Star-Bulletin, lambasting the Bishop Estate trustees and the political and judicial system that allows them to operate with impunity.

Governor Benjamin Cayetano then instructed Hawaii State Attorney General Attorney General Margery Bronster to investigate Bishop Estate and the issues raised in "Broken Trust."

Subsequently four of the five Hawaii Supreme Court justices announced they would no longer select Bishop Estate trustees.

### 1999 - Some of Plaintiffs here file amicus brief in *OHA v. State*

On May 29, 1999, some of plaintiffs here filed in the Hawaii Supreme Court an amicus curiae brief in *OHA v. State* arguing on behalf of the defendant State of Hawaii that the OHA laws are based on racial classifications and therefore presumptively invalid and subject to strict scrutiny. Also, Hawaiians have no "special" or "political" relationship, comparable to that of Indian tribes, which would exempt the OHA laws from strict scrutiny analysis.

### 1999 - IRS threatens to revoke tax exemption, trustees finally resign

The Internal Revenue Service threatened to remove KSBE's tax exempt status for

App. 12

abuse, saying it looks more "like a personal investment club" than a charity.  It called for

resignation or removal of all five trustees.

The Hawaii Circuit Court removed one trustee, accepted another trustee's

"temporary" resignation" and removed the other trustees temporarily.  Eventually all five

of the KSBE trustees resigned.

### 2000 – AG seeks surcharge former trustees over $200 million.

### No payment, "Global Settlement", records sealed.

Hawaii Deputy Attorneys General asked the Hawaii Circuit Court Judge to

surcharge the former trustees more than $200 million.  The Judge approved a "global

settlement" in which the former trustees admitted no wrongdoing and do not have to pay

surcharges, damages or restitution.  He ordered the file sealed.

### February 23, 2000 - *Rice v. Cayetano* decided by high court

On February 23, 2000, the Supreme Court of the United States in *Rice v,*

*Cayetano*, 528 U.S. 495, 514-516 (2000), struck down OHA's Hawaiians-only voting

restriction.  In applying the Fifteenth Amendment, the Court rejected the arguments to the

contrary by OHA and the State and held that the definitions of "Hawaiian" and "native

Hawaiian" are racial classifications.

Those definitions, which the highest court in the land determined to be racial

classifications, are the foundation and the only reason for the existence of OHA and

HHCA/DHHL.

In response, the State Legislature passed and the State Governor signed a bill

saying only Hawaiians are eligible to *serve* as OHA trustees.  The State of Hawaii Office

of Elections subsequently refused to issue nomination papers for election to the OHA

board of trustees to Kenneth Conklin, a qualified and registered Hawaii voter, solely because he is not "Hawaiian."

### March 2000 - Some of Plaintiffs here sought to intervene in *OHA v. State*

On March 28, 2000, a diverse, multi-ethnic group of 23 Hawaii men and women, some of whom are plaintiffs in this case, moved to intervene in the Hawaii Supreme Court in *OHA v. State* arguing, among other things, that the *Rice* decision together with the Supreme Court's other decisions holding all racial classifications presumptively invalid, if applied in a case challenging OHA itself, will require that OHA be invalidated and its claims be dismissed.

On May 8, 2000, the Hawaii Supreme Court denied the motion to intervene in *OHA v. State*. No reason was stated.

### July 2000 - Some of Plaintiffs here file first Arakaki suit.

On July 25, 2000, Kenneth Conklin and a multi-ethnic group of plaintiffs, some of whom are plaintiffs in this action, filed a suit in this Court, Civ. No. 00-00514 challenging the validity of the OHA candidacy restrictions. This Court declared the racial restriction invalid and ordered the State to permit otherwise eligible non-Hawaiians to run and, if elected, serve as OHA trustees.

### September 2001 - Hawaii Supreme Court dismisses *OHA v. State*

On September 12, 2001, the Hawaii Supreme Court in OHA v. State, reversed the 1996 Heely decision and dismissed the case for lack of justiciability. The Court said that, because it conflicts with federal legislation, "Act 304 'by its own terms' is effectively repealed."

The Hawaii Supreme Court did not rule on or even mention the federal Constitutional questions raised in the amicus brief and in the motion to intervene.  It nevertheless said,"the State's obligation to native Hawaiians is firmly established in our constitution" and "it is incumbent upon the legislature to enact legislation that gives effect to the right of native Hawaiians to benefit from the ceded lands trust." *OHA v. State*, Appeal Nos. 20281 & 20216 Decision, September 12, 2001.

## KSBE HAS CORRUPTED HAWAII'S GOVERNMENT, PURSUES HEREDITARY SUPERIORITY, DISASSIMILATION AND AKAKA BILL

A remarkable book by Senior U.S. District Court Judge Samuel P. King and trust Professor Randall W. Roth, former President of the Hawaii State Bar Association, has revealed the trustees of KSBE have so corrupted the political process in the State of Hawaii that the legislative, executive and judiciary powers have been, and still seem to be, concentrated in the hands of those who facilitated "A World Record for Breaches of Trust" by trustees and others of high position, without surcharge or accountability. *Broken Trust: Greed, Mismanagement & Political Manipulation at America's Largest Charitable Trust,* King and Roth, University of Hawaii Press, 2006.

Corruption within Bishop Estate Reached the Highest Levels of Government, But Major Records Still Under Seal *Six Prominent Community Leaders Share Their Part in the 'Broken Trust' Controversy, Call for Release of More Than 1Million Pages of Documents Kept Secret by the Court* By Malia Zimmerman, 7/10/2006 http://tinyurl.com/pwsgg.  KSBE put legislators on its payroll and used its alumni association as its proxy to lobby. Hawaii Reporter, *What Does Broken Trust Book Say About Ed Case and Dan Akaka?,* http://tinyurl.com/3x9fho.

The Honolulu Star-Bulletin Special Series Edition at

http://starbulletin.com/specials/bishop.html provides links to stories illustrating KSBE's

activist role in promoting segregation. See, for example, Aug. 4, 2005, "Rallies show

school support." At one of the rallies organized by KSBE, one speaker, a tenured

professor at U.H. Manoa, had this to say, "Some white men against us say they have been

here seven generations. Big deal. We won't assimilate and we won't go away, so sooner

or later, America will have to

deal with us."

The KSBE trustees continue to turn their backs on the unifying aspirations of

Bernice Pauahi Bishop by actively supporting the Akaka bill S.310/H.R.505 (which

would "recognize" Native Hawaiians as a privileged class, not based on merit or

achievement but solely because of their ancestry; establish a process for them to create

their own separate government and allow the state government, still dominated by KSBE,

to negotiate with the new Native Hawaiian government, also certain to be  dominated by

KSBE, for the breakup and giveaway of much of the domain of the State of Hawaii).

KSBE openly flaunts its participation with OHA, DHHL, the University of

Hawaii Center for Hawaiian Studies, Hawaii's Congressional delegation and a multitude

of others in supporting passage of the Akaka bill. KSBE and its Alumni Associations of

Northern and Southern California are members of CNHA, Council for Native Hawaiian

Advancement, http://www.hawaiiancouncil.org/members.html.

The nativehawaiians.com website, lists the co-conspirators: CNHA, the Kamehameha

Alumni Association, the prominent entities [many under KSBE's hegemony] that support

the Akaka bill; and a number of questionable groups such as the National Council of La

Raza, the organization that seeks to "liberate" the SouthWest.

http://www.nativehawaiians.com/listsupport.html.

### Racial Tensions are simmering in Hawaii's melting pot

So said the headline on the first page of USA Today 3/7/07 describing the attack Feb. 19th 2007 in the parking lot of the Waikele mall on Oahu, when a Hawaiian family beat a young soldier and his wife unconscious while their three year old son sat in the back seat of their car. The attack, "unusual for its brutality," sparked impassioned public debate.

The USA Today article and related links may be found at http://tinyurl.com/2jle2e . See also, The Gathering Storm, Chapter 1 of *Hawaiian Apartheid: Racial Separatism and Ethnic Nationalism in the Aloha State* by Kenneth R. Conklin, PhD http://tinyurl.com/2f7p8b.

The brutality at Waikele mall is a flashing red light.

Over 1 million American citizens in Hawaii are under siege by what can fairly be called an evil empire dedicated to Native Hawaiian Supremacy. That empire is dominated by KSBE, the nation's largest charitable trust, which has already conquered Hawaii's government and much of its business establishment.

Professor Carrington, referring to KSBE, puts it this way: As the ambition to achieve disassimilation rose, the instinct of the state's citizens who lacked the appropriate ancestor was to humor those who did, seemingly in the hope that tolerance and modest support would enable all to remain amiable neighbors. Few if any citizens stepped forward to question efforts to assign White Guilt to the polychromatic people of the state

when in 1993 Congress was asked to apologize for "the crime of 1893" and did so, with the possible implication that some further apology to a defiled group might be in order. . . . It discounted the possibility that its unwarranted apology might elevate the racist sentiment, as may have happened. *Testamentary Incorrectness: A Review* by Paul D. Carrington, Vol. 54 Buffalo Law Review 693, Dec. 2006.

*****************
End of Appendix